IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
                                  :
SMART VENT INC.,                  :     HON. JEROME B. SIMANDLE
                                  :
            Plaintiff,            :     Civil No. 10-168 (JBS/KMW)
                                  :
      v.                          :
                                  :          OPINION
USA FLOODAIR VENTS, LTD.,         :
                                  :
            Defendant.            :
                                  :
```

APPEARANCES:

Anthony J. DiMarino, III, Esq.
A.J. DIMARINO, III, PC
57 Euclid Street
Suite A
Woodbury, NJ 08096
     Counsel for Plaintiff

Robert Mahoney, Esq.
NORRIS, MCLAUGHLIN & MARCUS, PC
721 Route 202-206
PO Box 5933
Bridgewater, NJ 08807-5933
     -and-
Daniel P. Burke, Esq.
DANIEL P. BURKE & ASSOCIATES, PLLC
240 Townsend Square
Oyster Bay, NY 11788
     Counsel for Defendant

**SIMANDLE**, District Judge:

I.   **INTRODUCTION**

     One of the claims in this lawsuit is that Defendant
manufactured and sold flood vents that infringed on Plaintiff's
patent, United States Patent Number 5,944,445, entitled "Device
and Method for Relieving Flooding from Enclosed Space."  (Compl.
¶ 19-25; Pl.'s Ex. A "Patent '445.")  The Court convened a Claim

Construction Hearing on May 16, 2011 to determine the proper interpretation of certain disputed terms in Plaintiff's patent. See L. Pat. R. 4.6.  The principal issues are whether the phrase "enclosed space" as used in the patent includes the walls surrounding the space; whether the patent's use of the adjective "tidal" limits it to flooding related to the tides of the ocean, as distinct from rising and falling flood water generally; and whether the description of the operation of the flood gate's latching mechanism is amenable to construction.

## II.  BACKGROUND

Patent Number 5,944,445 describes a flood gate that is used as both a ventilation system for enclosed spaces and as a pressure release valve in the event of flooding.  (Patent '445 Col. 2 ln. 57 - Col. 3 ln. 50.)  The preferred embodiment is the size of one or two cinder blocks and is secured to an opening in the wall.  (Patent '445 Col. 4 ln. 15-24.)  It features temperature-controlled shutters for appropriate ventilation under ordinary conditions, and during times of flooding a larger gate swings open to vent water in order to equalize pressure between the inside and outside of the enclosed space.  (Patent '445 Col. 2 ln. 57 - Col. 3 ln. 50.)

The conclusion of the invention's description includes the following claims as to the subject matter of the invention:

1.   A flood gate for use in an enclosed space, the flood gate comprising:
    a frame having side walls defining a fluid passageway therethrough;
    a door pivotally mounted in said frame for bidirectional rotation between two open positions and a closed position therebetween to permit tidal water flow therethrough; and,
    at least one catching assembly for holding the door in said closed position against a minimum level of pressure of said tidal water flow;
    whereby tidal flood waters exceeding said minimum pressure level are automatically vented through said enclosed space reducing a risk of structural damage from said tidal flood waters.
                    . . .

6.   The flood gate according to claim 1, wherein said catching assembly comprises:
    at least one catch;
    at least one resilient member; and,
    at least one detent sleeve;
    whereby the catching assembly can maintain said door in said closed position until said minimum pressure is applied to cause the door to swing into one of said open positions.

7.   The flood gate according to claim 1 wherein said enclosed space is a foundation crawl space.

(Patent '445 Col. 5 ln. 56 - Col. 6 ln. 66.)

    Plaintiff claims that Defendant infringed this patent. Defendant maintains that the language of the claims limits Plaintiff's patent to a device to be used entirely within an enclosed space to vent ocean tides — rendering the device inoperable, if not nonsensical. Defendant further argues that Claim 6's description of the catching assembly and its

constituent parts is not amendable to construction.

## III.  DISCUSSION

### A.  Standard of Review

The patent code requires a patent to describe the invention sufficiently to enable one of ordinary skill in the art to make and use it.  35 U.S.C. § 112, para. 1; Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995).  This description of the invention, called the specification, typically includes drawings and an explanation of the preferred embodiment of the invention.  The statute also requires the applicant for a patent to conclude the specification of the invention with claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." § 112, para. 2; Markman, 52 F.3d at 979.  Though it is interpreted in light of the entire patent, it is solely this set of carefully-worded technical descriptions called claims that ultimately determine the bounds of what is protected by the patent.  Id. at 980.

Claim construction is the determination of what is and is not covered by the claims.  Netword, LLC v. Central Corp., 242 F.3d 1347, 1352 (Fed. Cir. 2001).  The meaning of the claims is a matter of law to be decided by the Court.  Novartis Corp. v. Teva Pharmaceuticals USA, Inc., 565 F. Supp. 2d 595, 602-03 (D.N.J.

4

2008) (citing Markman v. Westview Instruments, Inc., 517 U.S.
370, 377-90 (1996)).  The Court's task is to give each disputed
term the ordinary and customary meaning that the term would have
to a person of ordinary skill in the art in question at the time
of the invention.  Phillips v. AWH Corp., 415 F.3d 1303, 1313
(Fed. Cir. 2005).

      To determine the proper meaning of a disputed term in a
claim, the Court looks first to the intrinsic evidence: the claim
language itself, the specification, and the prosecution history.
See Digital Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335,
1344 (Fed. Cir. 1998).  Claims are not meant to be read as an
independent text.  Instead, they are to be interpreted
consistently with the patent as a whole.  See Markman, 517 U.S.
at 389 ("[A claim] term can be defined only in a way that
comports with the instrument as a whole."); Merck & Co. v. Teva
Pharms. USA, Inc., 347 F.3d 1367, 1371 (Fed. Cir. 2003)
("[C]laims must be construed so as to be consistent with the
specification, of which they are a part.") Netword, 242 F.3d at
1352 ("The claims are directed to the invention that is described
in the specification; they do not have meaning removed from the
context from which they arose.").

      If the intrinsic evidence fails to disclose the meaning of a
claim's terms, a court may look to extrinsic evidence, such as
expert and inventor testimony, dictionaries, and learned

treatises.  Novartis, 565 F. Supp. 2d at 607.  The Court may
"rely on dictionary definitions when construing claim terms, so
long as the dictionary definition does not contradict any
definition found in or ascertained by a reading of the patent
documents."  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576,
1384 n.6 (Fed. Cir. 1996); see also Phillips, 415 F.3d at 1318-
19.

     When there is genuine ambiguity in the meaning of a term, it
should be construed to preserve the validity of the patent.
Phillips, 415 F.3d at 1327 (citing Generation II Orthotics Inc.
v. Med. Tech. Inc., 263 F.3d 1356, 1365 (Fed. Cir. 2001)).
Conversely, when a claim as written is susceptible to only one
interpretation, then the Court cannot rewrite the claim in order
to preserve the patent's validity.  See Chef America, Inc. v.
Lamb-Weston, Inc., 358 F.3d 1371, 1374 (Fed. Cir. 2004).


     B.  **Constructions**

          1.  The meanings of "in an enclosed space", "through
              said enclosed space," and "foundation crawl space".

     Plaintiff maintains that the phrase "enclosed space" should
be read to mean "an area surrounded by walls, including the
walls."  [Docket Item 23 "Joint Claim Construction" at 2.]
Defendant argues that "an enclosed space" means "a space entirely
surrounded by walls, but not including the walls."  [Id.]  As a

result of these dueling definitions, the parties disagree about what it means to be "in" such an enclosed space and to be vented "through said enclosed space."[1]  Both sides agree that the preferred embodiment of the device is placed in the wall and acknowledge that a flood vent with no access to the outside is an absurd, inoperable device.

The Court begins, therefore, with the observation that "a claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct."  See On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH, 386 F.3d 1133, 1138 (Fed. Cir. 2004); see also Phillips, 415 F.3d at 1327 ("[A]mbiguity in the claim language should therefore be resolved in a manner that would preserve the patent's validity.").  The question is therefore whether these terms can mean what Plaintiff says they mean without rewriting them or altering their ordinary meanings or those meanings either expressly or implicitly assigned them by the patent.

Chef America is an example of claim construction leading to an absurd result that is nevertheless required by the plain language of the claim and the other intrinsic evidence.  The disputed phrase was "heating the resulting batter-coated dough to a temperature in the range of about 400° F to 850° F," and the

---

[1]  Plaintiff has conceded that the preamble of Claim 1, in which the phrase "in an enclosed space" appears, is limiting.

question was whether this phrase could mean that the dough was to be heated in an oven of that temperature, but that the dough itself was not heated to that temperature.  Id. at 1371.  The Court found that heating an object "to" a specified temperature has an unambiguous definition in the context of cooking.  Id.; see also Ortho-McNeil Pharmaceutical, Inc. v. Mylan Laboratories, Inc., 520 F.3d 1358, 1362-63 (Fed. Cir. 2008) (noting that this was the only possible interpretation of the Chef America claim).  Not only did the Court find that actual language of the Chef America patent to be unambiguous, but it also found that the specification and the prior art supported that meaning — indeed, even "the prosecution history suggests that the patentees intentionally used 'to' rather than 'at' in drafting the temperature requirements of the claim."  Chef America, 358 F.3d at 1373.

Unlike the disputed terms in Chef America, the phrases "in an enclosed space" and "through said enclosed space" do not unambiguously mean what Defendant proposes, and therefore need not be interpreted to render the device inoperable and exclude the clearly described preferred embodiments of the device.  The meaning of the phrase "in an enclosed space" is contextually-sensitive to the nature of the object whose location is being described.  The ordinary meaning of "installing a window in a house" is placing a window in the wall that separates the inside

8

of a house from the outside of it.  Similarly, the phrase
"putting sound-proof insulation in a living room" means placing
sound-proof insulation into the walls of a living room.  One
understands these meanings even though the ordinary meaning of
placing or using an object "in a house" and "in a living room" is
that the object is not in the walls.  Like many words, relying on
dictionary definitions for what it means to be "in" an "enclosed
space" does not describe the extent of the ordinary meanings of
these terms in every context; in this case, it is the nature of
the object in question — a vent, like a window or insulation —
that makes clear what it means for the object to be used "in"
such a location.  Describing a flood vent as being "for use in an
enclosed space," admits of the meaning that it is to be installed
in the wall separating the enclosed space from the outside.  The
same analysis applies to the phrases "vented through said
enclosed space" and "foundation crawl space."

These constructions are supported by the specification and
the prior art.  The preferred embodiment makes clear that this is
a device installed in a wall.  (Patent '445 Col. 4 ln. 15-24.)
The patent uses the phrase "in an enclosed space" to distinguish
the invention from the prior art, because there existed similar
flood vents used in other contexts outside enclosed spaces, such
as a gate for an irrigation ditch, for which the ventilation
function is not necessary.  (Patent '445 Cl. 2 ln. 3-21.)  The

9

description of prior art notes that there are water pressure release systems for unenclosed spaces, and there are ventilators for enclosed spaces, but no one had yet invented a foundation ventilator that will also act as a water pressure release valve. The invention thus provides the first "integrated method to automatically ventilate an enclosed space of a foundation while allowing for the relief of liquid pressure on either side of the vent."  (Id.)

Defendant notes that a related Smart Vent patent uses the phrase "enclosed space" in such a way that it cannot logically include the wall.  See Goldenberg v. Cytogen, Inc., 373 F.3d 1158, 1167 (Fed. Cir. 2004) (allowing as intrinsic evidence patents with a familial relationship to the patent in question).  This subsequent patent, which is labeled as a continuation-in-part of the patent at issue in the present suit, repeatedly describes the vent being used "in a foundation wall adjacent an enclosed space."[2]  (Def.'s Ex. C "Patent '050" at Col. 7 ln. 15 - Col. 8 ln. 47.)  If an enclosed space includes the walls enclosing it, Defendant argues, then it would make no sense to describe the wall as being adjacent to itself.

While it is true that the claims of the '050 patent use the

_____

[2]  A continuation-in-part application contains subject matter from a prior application and may also contain additional matter not disclosed in the prior application.  See Augustine Medical, Inc. v. Gaymar Industries, Inc., 181 F.3d 1291, 1302 (Fed. Cir. 1999).

phrase "enclosed space" more narrowly than the '445 patent, the difference in usage does not show that the '445 patent should be read to mean the device is not placed in the wall.  The underlying principles in the use of related patents to construe each other's claims is that the same author will use the same terms to mean the same things, and that since the described devices are related, one can understand the related parts by seeing how they are described in the other patent.  The typical case in which a related patent is helpful for interpretation is an ambiguity in a claim term that is clarified in a related patent's more precise definition, which definition is then imported into the ambiguous patent's use of the same term.  In Jonsson v. Stanley Works, 903 F.2d 812 (Fed. Cir. 1990), for example, a patent used the phrase "diffuse light," and there was a dispute about whether this required multiple sources of light. The Court found that the patent in question was based on a continuation-in-part application.  Id. at 817.  The earlier application relied on the fact that the light was from multiple sources to distinguish prior art; moreover, several other parts of the patent history and the inventor's deposition supported this construction.  Id. at 817-19.  Thus, even though the individual patent itself did not necessitate this reading, the related patents did.  Id.  The typical case also involves a subsequent patent being construed in light of an earlier related

patent.  See, e.g., id.; Omega Engineering, Inc, v. Raytek Corp.,
334 F.3d 1314 (Fed. Cir. 2003) ("[A]n interpretation asserted in
the prosecution of a parent application can also affect
continuation applications.").

Here, however, Defendant seeks to use a subsequent patent to
reach an interpretation of a prior patent that shows the prior
patent to describe a different, inoperable device.  Instead of
relying on the presumption of the similarity of the devices, or a
presumption that the latter patent relied on the validity of the
prior patent (as in the case of its distinctions from prior art),
Defendant's argument works against these presumptions.
Consequently, this use of related patents makes a less compelling
case for claim construction.  Defendant presents no authority in
which a Court imported a subsequent patent's narrower use of a
term into a prior patent in such a way as to have the prior
patent describe an inoperable device.  Such reasoning would
inhibit the patentee's use of clearer or more precise language in
subsequent patents, to no particular end.

The more natural interpretation of the two related patents'
use of the term "enclosed space," an interpretation which is
consistent with their describing devices to be used in the same
locations, is that the latter patent is simply using "enclosed
space" in slightly more precise way.  That the patentee regarded
"in an enclosed space" and "in a foundation wall adjacent to an

enclosed space" as essentially interchangeable is demonstrated by the '050 patent's specification.  It describes the '050 device as being "for use in a foundation crawl space" to vent water "through the crawl space," even though it goes on to describe the device was being placed in a wall adjacent to the space.  (Patent '050 at Col 3. ln. 14-27.)  Defendant's proposed construction therefore not only calls for reading a subsequent patent to render inoperable the prior patent's described device, but also calls for the subsequent patent's claims to conflict with its own specification.

The Court finds that the language of the '050 patent does not support Defendant's construction of the '445 patent.  The clear and ordinary meaning of these related phrases in the context of these patents is that they include the walls of these spaces.  "In an enclosed space" means inside an area surrounded by walls, including the walls.  "Through said enclosed space" means in and out of an area surrounded by walls, including the walls.  And "foundation crawl space" means that portion of a building below the lowest elevated floor that is surrounded by walls, having a clearance of less than human height, including the walls of that space.


2.  <u>The meanings of "tidal water flow" and "tidal flood waters"</u>

13

Plaintiff argues that both the terms "tidal water flow" and "tidal flood waters" mean "[t]he rise and fall of flood waters." [Joint Claim Construction at 2-3.]  Defendant contends that "tidal water flow" means "movement of water caused by the tides," and that "tidal flood waters" means "water exceeding its usual level due to water current caused by the tides."  [Id.]  In short, the parties disagree about whether the term "tidal" modifies these phrases to limit them to water related to the ocean tides.

It is true that, absent other context, one expects "tidal" to refer to ocean tides.  But that is not the exclusive definition, and context may just as easily point to the secondary definition of the term: rising and falling (i.e., the kind of rising and falling water necessitating a vent that permits water to pass through one way, and then back out).  See Merriam-Webster Online Dictionary, tidal, http://www.merriam-webster.com/dictionary/tidal (1b: "Periodically rising and falling or flowing and ebbing").  To the extent the term standing alone is ambiguous as to whether it refers to any waters that periodically rise and fall, or only those waters rising and falling as a result of ocean tides, the context of the patent itself resolves this ambiguity.

Defendant's proposed construction would have the patent limit the invention based on the source of the water, a

14

limitation bearing no relationship to any aspect of the device itself, whereas Plaintiff's construction of "tidal" as meaning ebbing and flowing or rising and falling does explain the purpose and function of the device, which vents water bidirectionally. There is no mechanism by which this relatively simple device could determine the difference between water from excessive rainfall, a broken levee, or ocean tides.  No reasonable reader of ordinary skill in the development of flood vents could understand the invention to do anything other than vent flood water that has built up with sufficient pressure, from whatever source.

Plaintiff's proposed definitions do not entirely capture the meaning of the phrases "flow" and "flood waters," but do accurately define "tidal."  The Court adopts the parts of Defendant's definitions referring to flow and flood, and adopts Plaintiff's definition of tidal.  "Tidal water flow" means rising and falling movement of water.  "Tidal flood waters" means water exceeding its usual level that rises and falls.


3.   The meaning of "bidirectional rotation"

Plaintiff maintains that the "door pivotally mounted in said frame for bidirectional rotation" refers to a door pivotally mounted in the frame such that it is capable of "swinging in opposite directions."  [Joint Claim Construction at 3.]

Defendant contends that in order to be considered "rotation," the
movement must involve "moving in two opposite directions about a
central axis."  [Id.]  The door as described in the patent
rotates about an axis on one end to the frame.  The drawings
represent it this way:



((Patent '445 Fig. 1.)  Its movement describes an upside-down v-
shape such that one end of the door is on a hinge from which the
door swings, and the vent is closed when the vent is in the l-
shaped position.  Defendant argues that "rotation," and by
extension "bidirectional rotation" must involve rotation around
an axis that passes through the object itself — in other words,
that its movement must be roughly x-shaped.  [Joint Claim
Construction at 7.]

    Defendant relies exclusively on a definition of "rotation"
found in Larousse's Dictionary of Science and Technology (1st ed.
1995).  That work defines "rotation" as an astronomical term

16

meaning "the term generally confined to the turning of a body
about an axis passing through itself, e.g. rotation of the Earth
about its polar axis in one sidereal day." Id. at 950.  Even if
the Court were to see the need to reach for extrinsic evidence in
order to understand the meaning of "rotation" in this context, it
would not choose the definition of the term as used in astronomy,
as the door in this flood gate is not a celestial body.  A brief
review of other dictionaries shows the astronomical use of the
term, requiring the center of rotation to be within the body
itself, to be the outlier — perhaps in order to distinguish
rotation from orbit when referring to celestial bodies.  See,
e.g., Cambridge Online Dictionary of American English, rotate,
http://dictionaries.cambridge.org/ ("to turn around a fixed
point, or to cause (something) to do this").

     "Bidirectional rotation" means swinging in opposite
directions.


          4.  The meanings of "minimum level of pressure,"
          "catching assembly," and other terms related to the
          catching assembly: "catch," "resilient member," and
          "detent sleeve"


     The manifest purpose of this flood gate is to remain closed
under ordinary circumstances, but open when sufficient pressure
from flood water accumulates.  To accomplish this, the flood gate
features a latching mechanism, which the specification states is

17

also referred to as a catching assembly.  (Patent '445 Col. 3 ln. 21-27.)  The preferred embodiment of the catching assembly illustrated in Figure 10 involves two rounded rods contained in a slightly larger hollow rod within the door, and separated inside the larger hollow rod by a spring.  (Patent '445 Fig. 10, Col. 4 ln. 52-60.)  The ends of the rounded rods are pressed by the spring separating the rods into little voids in the side rails of the flood gate called "detent sleeves."  (Id.)  Pressure against the door caused by flood water is translated by the rounded end of the rods into pressure compressing the spring, such that a sufficient amount of pressure will cause the rods to be pushed back into the door, allowing the door to swing freely.  The alternative embodiment of the flood gate described in the specification features a catching assembly illustrated in Figure 3.  (Patent '445 Fig. 3, Col. 5 ln. 13-27.)  Instead of rods, this mechanism relies on similar principles but uses a ball bearing.  The door is held in place by a ball bearing pressed out from the door into a void in the door's frame.  (Id.)  The ball is pressed into the void by a spring, which is connected to a screw that is used to adjust the compression of the spring. (Id.)  Thus, when pressure on the door is sufficient — which varies depending on how tightly the spring is compressed by the screw — the ball bearing is rolled slightly into the door, allowing the door to swing freely.

As described in Claim 1, the device involves "at least one catching assembly for holding the door in said closed position against a minimum level of pressure of said tidal water flow; whereby tidal flood waters exceeding said minimum pressure level are automatically vented through said enclosed space . . ."  The catching assembly is further described in Claim 6 as comprising a "catch," a "resilient member," and a "detent sleeve . . . whereby the catching assembly can maintain said door in said closed position until said minimum pressure is applied to cause the door to swing into one of said open positions." (Patent '445 Col. 6 ln. 29-48.)

The parties engage in a number of interrelated disputes regarding the terms used in these two sections.[3]

### i. "Minimum pressure" phrases

Claim 1 says that the flood gate door is held by the catching assembly in a "closed position against a minimum level of pressure of said tidal water flow . . . whereby tidal flood waters exceeding said minimum pressure level are automatically vented . . . "  Claim 6 then states "the catching assembly can maintain said door in said closed position until said minimum pressure is applied to cause the door to swing into one of said

_____

[3]  The terms "automatically" and "exceeding," while initially disputed, are no longer disputed and therefore no longer subject to claim construction at this stage.

open positions."  Thus, according to the claims, the catching
assembly stays closed "against a minimum level of pressure" until
that level is exceeded but also opens when "said minimum pressure
is applied."  Defendant argues that this apparent contradiction
about the state of the door at the threshold of pressure makes it
so that the variations on "minimum pressure" and the term
"catching assembly" are not amendable to construction.  The Court
disagrees.

The phrases "minimum level of pressure" and "said minimum
pressure level" are unambiguously being used in slightly
different ways in the different sentences in Claims 1 and 6.  In
Claim 1, the "minimum pressure" phrases refer to pressure below
the level of pressure that causes the door to open.  Claim 1
defines these phrases by implication, having them mean a level of
pressure which, once exceeded, results in opening of the door.
(Patent '445 Col. 5 ln. 65 - Col. 6 ln. 4.)  This is consistent
with the embodiments described above, and the specification
generally which notes that the door is to hold closed against a
minimum level of pressure, and that "[t]he amount of pressure
required to open the flood vent is determined by coastal
construction regulations." (Patent '445 Col. 3 ln. 7 - 28.)
Claim 6 uses the phrase "minimum pressure" in a slightly
different, but nevertheless unambiguous way given the sentence-
level context, to refer the level of pressure at which the door

opens.  In other words, the phrases as used in claim 1 do not encompass the instant when the door is opened by the pressure, whereas the phrase as used in claim 6 does encompass this precise moment.  In context, no reasonable reader is confused by the slightly differing use of these terms.[4]

The various "minimum pressure" phrases are amenable to constructions consistent with their ordinary meaning in this context notwithstanding their slightly differing use involving whether they are inclusive or exclusive of the precise threshold of pressure necessary to open the door.  "Minimum level of pressure" and "said minimum pressure level" mean the pressure at

_____

[4]  Even if all three "minimum pressure" terms were construed identically, the difference in construction would be irrelevant. If the terms are read to mean the same thing, then the catching assembly is indefinite as to whether it holds the door closed at the theoretical and infinitesimally precise level of pressure constituting the exact threshold.  But the requirement for definiteness applies to whether the claims have adequate boundaries, not whether they precisely describe every abstract concept related to the operation of the device.  "The definiteness requirement . . . does not compel absolute clarity." Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005).  Finding a claim to be indefinite requires "clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim." Halliburton Energy Servs., Inc. v. M-I LLC, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008).  Even if the "minimum pressure" phrases are construed identically, a skilled artisan can easily discern the bounds of Claim 6 in light of Claim 1.  Both claims leave no doubt about what happens before the sufficient level of pressure is applied (the door is closed), are not vague about what happens once that level is exceeded (the door opens), and are definite about the role of this concept of minimum pressure with regard to the actual construction and function of the device (the device's door does not just swing with any amount of pressure; it is to remain closed until an unspecified but discrete level of pressure is exceeded).

or below which the door remains closed.  "Said minimum pressure"
means the pressure level just sufficient to cause the door to
open.

> ii.  <u>The meanings of "catch" and "catching
>       assembly"</u>

Plaintiff argues that a "catch" is a "device for checking or
stopping motion."  [Joint Claim Construction at 3.]  Defendant
argues that "catch" is "something that checks or holds something
immovable."  [<u>Id.</u>]  Plaintiff argues that a "catching assembly"
is any "latching mechanism," while Defendant proposes that the
term be construed more narrowly as "a group of parts that are fit
together to form a self-contained unit that holds something
immovable."  [<u>Id.</u>]  Essentially, Defendant's argument is that a
component is not a catch if it merely impedes motion without
every holding that something immovable.  Thus, it is incorrect to
define a catch as something that either checks or stops motion.
Plaintiff appears to agree that checking does not include holding
something immovable.

There is no genuine dispute here.  Defendant does not, and
could not reasonably argue that a catch holds something immovable
permanently.  And Plaintiff does not, and could not reasonably
argue that something is a catch if it does not at least render
another object immovable temporarily.  Both sides, it would
appear, agree that a catch temporarily renders another object
immovable until some other condition is met.  A "catch" means a

device for checking or stopping motion.  Consistent with the definition of "catch," "catching assembly" means a group of parts functioning as a unit to check or stop motion.

                iii.  <u>The meaning of "resilient member"</u>

Plaintiff argues that a "resilient member" is "a component that returns back to its original form after being bent, compressed or stretched."  [Joint Claim Construction at 3.] Defendant argues that it is "a constituent piece of a complex structure which is able to recoil or spring back into shape after bending, stretching or being compressed."  [<u>Id.</u>]

As with the dispute over "catch," this dispute is largely illusory.  Defendant argues that its definition is the only one that gives meaning to the term "member," but Plaintiff's definition calls it a "component."  A component is a piece of a larger whole.  At the hearing, the dispute was reduced to whether the larger whole must be described as "complex" or not.  The Court finds no basis in either the intrinsic or extrinsic evidence for requiring some unspecified threshold of complexity in the larger structure for one of its component parts to be considered a "member."  And therefore the Court adopts Plaintiff's proposed definition:  A component that returns back to its original form after being bent, compressed or stretched.

iv.  <u>The meaning of "detent sleeve"</u>

The final dispute is over a part of the device with the odd label "detent sleeve."  Plaintiff argues that "detent sleeve" simply refers to any "notch or indentation mechanism that keeps the door in a closed position but that will release the door upon the application of pressure on the door."  [Joint Claim Construction at 3.]  Defendant offers the slightly different proposed meaning that interprets the phrase to mean "a tubular part that locks the movement of the catch to hold the door immovable until the minimum force is applied to the detent sleeve or catch."  [<u>Id.</u>]  The principal difference between the definitions is whether "sleeve" is limited to tubular structures.

The ordinary meaning of "sleeve" connotes a tube, but Plaintiff argues that the patent itself shows the term to include non-tubular notches or indentations, as in Figure 10. Unfortunately, Figure 10 is not a paragon of clarity.  Here is the relevant section of the drawing, featuring the label of the detent sleeve (166):



(Patent '445 Fig. 10 (excerpt).)  The relevant description is:
"The tips [of the rods] extend past the edge of the door panel so
as to be received by detent sleeves extruding (sic.) from both
side rails."  By inference, the Court gathers that the small v-
shaped void below the rounded rod is supposed to be a divot,
since if it were a v-shaped trench it would not operate to stop
the door from swinging as described (i.e., in the direction in
and out of the page).  However, if this drawing is supposed to
represent a cross-section of that divot, then the figure is
improperly drawn, as all cross-sections are required to be cross-
hatched, like the rest of the cross-sections in the drawing are.
And, in any case, even in Figure 10 the feature labeled by the
lead line is the larger t-shaped tubular structure.

The ordinary meaning of "sleeve" applies here, which refers
to a tubular structure in every dictionary the Court has seen
(when not referring to a flat open-ended covering for an album or
a laptop).  The absence of clear support in the specification for
sleeve carrying a different meaning, the Court will adopt a
definition requiring the structure to be tubular.

Defendant's proposed definition, however, includes many
words which are not part of the meaning of "detent sleeve" as
used in this patent.  It does not "lock the movement of the
catch," nor is force applied to the "detent sleeve."  As used in
the patent, and consistent with the ordinary meanings of "detent"

and "sleeve," a "detent sleeve" is a tube that, as part of the catching assembly, acts to catch another component.

## IV.   CONCLUSION

Many parts of patent '445 are poorly drafted.  Fortunately for Plaintiff, the device being described is exceedingly simple. No turn of phrase in the patent is so badly worded as to obscure the meaning being given to it by the patent.  Claims are not meant to be a standalone text, which can be read in isolation to determine the breadth of the patent.  They are instead part of an integrated document, and may be given meaning by the implication of those other parts.  Phillips, 415 F.3d at 1315 (citing Markman, 52 F.3d at 978).  This does not mean that ordinary words can be given bizarre meanings by the operation of subtle implication.  But it does mean that claim terms must be given their clearly implied secondary or tertiary definitions.  In this case, any ambiguity raised by Defendant's arguments is clearly resolved in each case by looking to the other relevant context. No reasonable reader of ordinary skill in the art can examine this patent and understand the disputed terms to mean anything other than the meanings discussed herein.  The accompanying Order will be entered.

**May 25, 2011**                            **s/ Jerome B. Simandle**
Date                                    JEROME B. SIMANDLE
                                        United States District Judge