IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SMART VENT, Inc., | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | Civil Action No. 10-168 (JBS/KMW) |
| v. | |
| USA FLOODAIR VENTS, LTD., | **OPINION** |
| Defendant. | |

APPEARANCES:

Anthony J. DiMarino, III, Esq.
A.J. DIMARINO, III, PC
57 Euclid Street, Suite A
Woodbury, NJ 08096
        -and-
Norman Elliot Lehrer, Esq.
1205 North Kings Highway
Cherry Hill, N.J. 08034
        Counsel for Plaintiff

Robert Mahoney, Esq.
NORRIS, MCLAUGHLIN & MARCUS, PC
721 Route 202 206
PO Box 5933
Bridgewater, NJ 08807 5933
        -and-
Daniel P. Burke, Esq.
DANIEL P. BURKE & ASSOCIATES, PLLC
240 Townsend Square
Oyster Bay, NY 11788
        Counsel for Defendant

**SIMANDLE, Chief Judge:**

**I.    INTRODUCTION**

        In this patent infringement action, Plaintiff Smart Vent,

Inc. (hereinafter, "Plaintiff"), generally alleges that

Defendant USA Floodair Vents, Ltd.'s (hereinafter, "Defendant") production and/or distribution of a "certified" flood vent infringes one or more claims of Plaintiff's patent, entitled a "Device and Method for Relieving Flooding from Enclosed Space" (hereinafter, the "'445 patent" or the "Patent").  The Court conducted a claim Construction Hearing on November 10, 2014 (hereinafter, the "Markman hearing"), in order to determine the proper interpretation of certain disputed terms in the '445 patent.

The principal issues for the purposes of claim construction are: (1) whether the phrase "ventilation opening" as used in the Patent connotes an unobstructed opening for the free passage of air, or whether the term includes a functional or performance requirement that only permits the passage of air in an amount "sufficient" to enable the claimed ventilation; (2) whether the claimed invention's "screen" requires a "mesh structure"; (3) whether the phrase "standard concrete masonry unit (CMU)" indicates that the claimed invention possesses fixed, or varied, dimensions; (4) whether "pull tabs" form part of the claimed invention's "door"; and (5) whether the "front portion" or face plate comprises part of the claimed invention's "outer frame."

## II.   BACKGROUND

### A. Factual Background

The '445 Patent generally describes a flood vent that serves as an air ventilation system and water pressure release valve for foundational crawlspaces.  ('445 patent Col. 2, ln. 57 – Col. 3, ln. 50.)  In the preferred embodiment, the vent has an outer frame formed of polypropylene, secured by screws to an opening in the wall adjacent to the crawl space, and with dimensions the size of one or two cinder blocks. (Id. at Col. 4. ln. 15-27.)  The flood vent primarily features a flood gate comprised of an automatic louver assembly that opens and closes in response to ambient temperatures and/or the pressure level associated with tidal flood waters.  (Id. at Col. 3. ln. 12-33.) The claimed invention therefore endeavors to provide appropriate crawl space ventilation according to the temperature, and to reduce the risk of structural damage from tidal flood waters by allowing such waters to automatically vent through the crawl space when the water pressure exceeds a certain minimum threshold.  (Id.)

The Court issued its first claim construction Opinion in this action on May 25, 2011.  [Docket Item 47.]  On December 5, 2011, the United States Patent & Trademark Office (hereinafter, the "USPTO") granted Defendant's request for reexamination of Claims 1-11 of the '445 patent [Docket Item 65], and the Court

stayed this litigation pending reexamination.  [Docket Item 82.]
On February 12, 2014, the USPTO issued an Ex Parte Reexamination
Certificate for the '445 Patent, identified as C1.  [Docket Item
110-4.]  In connection with the Reexamination, the USPTO
cancelled Claims 2 and 7 of the original Patent, amended Claims
1, 3, 4, 5, 6, and 8, and added Claims 12-15.  [Id.]  The new
Claims, which give rise to the pending claim construction
proceeding, specifically claim the following concerning the
subject matter of the disputed invention:

> 12.    A flood gate for use in an enclosed space,
> the flood gate comprising:
>     a frame having side walls defining a fluid
> passageway therethrough;
>     a door pivotally mounted in said frame for
> bidirectional rotation between two open positions and
> a closed position therebetween to permit tidal water
> flow therethrough, said door having at least one
> ventilation opening covered by a screen that moves
> with the door; and,
>     at least one catching assembly for holding the
> door in said closed position against a minimum level
> of pressure of said tidal water flow;
>     whereby tidal flood waters exceeding said minimum
> pressure level are automatically vented through said
> enclosed space reducing a risk of structural damage
> from said tidal flood waters;
>     wherein the fluid passageway has the width and
> height of a standard concrete masonry unit.
>
> 13.    A flood gate for use in an enclosed space,
> the flood gate comprising:
>     an outer frame having four side walls defining a
> fluid passageway therethrough, wherein the outer frame
> has a width of a standard concrete masonry unit (CMU),
> a height of one or two CMUs, each of the four side
> walls having a depth of 3";
>     a door pivotally mounted in said frame for
> bidirectional rotation between two open positions and

a closed position therebetween to permit tidal water
flow therethrough; and,
    at least one catching assembly for holding the
door in said closed position against a minimum level
of pressure of said tidal water flow,
    whereby tidal flood waters exceeding said minimum
pressure level are automatically vented through said
enclosed space reducing a risk of structural damage
from said tidal flood waters.

    14.    The flood gate according to claim 13,
wherein the door comprises a door frame enclosing a
louver panel.

    15.    A flood gate for use in an enclosed space,
the flood gate comprising:
    an outer frame having side walls defining a fluid
passageway therethrough, wherein the outer frame has a
width of a standard concrete masonry unit (CMU), a
height of one or two CMUs;
    a door pivotally mounted in said frame for
bidirectional rotation between two open positions and
a closed position therebetween to permit tidal water
flow therethrough, wherein the door is recessed from
the front and back of the outer frame, and includes a
ventilation opening; and,
    at least one catching assembly for holding the
door in said closed position against a minimum level
of pressure of said tidal water flow,
    whereby tidal flood waters exceeding said minimum
pressure level are automatically vented through said
enclosed space reducing a risk of structural damage
from said tidal flood waters.

(Burke Dec., Ex. A (hereinafter, the "'445 Patent C1").)

## III. STANDARD OF REVIEW

    It is well-understood that a "claim in a patent provides

the metes and bounds of the right which the patent confers on

the patentee to exclude others from making, using or selling the

protected invention."  Corning Glass Works v. Sumitomo Elec.

U.S.A., Inc., 868 F.2d 1251, 1257 (Fed. Cir. 1989).  The proper

construction of claim terms, however, constitutes a question of law, Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996), and the Court need not follow the parties' proposed constructions.   See Marine Polymer Techs., Inc. v. HemCon, Inc., 672 F.3d 1350, 1359 n.4 (Fed. Cir. 2012) (en banc).

Rather, courts construe such terms in accordance with their "'ordinary and customary meaning[,]'" e.g., "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations omitted).   In so determining, however, the Court need not construe claim terms in isolation.   Id. at 1321.   Rather, the Court should determine the term's "meaning to the ordinary artisan" based upon a review of the patent in its entirety, id. at 1321, and guided by the panoply of available intrinsic (the claims, the specification, and the prosecution history) and extrinsic evidence.   See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).

To that end, courts first rely upon the claim terms themselves, because "[i]t is a 'bedrock principle' of patent law that 'the claims of [the] patent define'" the scope of the claimed invention.   Phillips, 415 F.3d at 1312 (quoting

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,
381 F.3d 1111, 1115 (Fed. Cir. 2004)).  In so considering,
courts construe the terms in "the context" of the asserted claim
and "[o]ther claims" of the disputed patent, both of which
"provide substantial guidance as to the meaning of particular
claim terms."  Id. at 1314.  Differences among claims may also
prove instructive, particularly because "the presence of a
dependent claim that adds a particular limitation gives rise to
a presumption that the limitation in question is not present in
the independent claim."  Id. at 1314–15.

     In addition to the words of the claims, courts look to the
patent specification, which "contains a written description of
the invention that must enable one of ordinary skill in the art
to make and use the invention."  Markman, 52 F.3d at 979.  The
specification "necessarily informs" claim construction, because
the Patent Code requires inventors to provide "a 'full' and
'exact' description" of the claimed invention.  Phillips, 415
F.3d at 1316.  The specification may therefore reveal "a special
definition given to a claim term by the patentee that differs
from the meaning it would otherwise possess" or "an intentional
disclaimer, or disavowal, of claim scope by the inventor."  Id.
In that regard, the specification may prove "the single best
guide to the meaning of a disputed term."  Id. at 1315; see also
Standard Oil Co. v. Am. Cyanamid Co., 774 F.2d 448, 452 (Fed.

Cir. 1995) ("The specification is, thus, the primary basis for construing the claims."). It does not, however, provide "a substitute for, nor can it be used to rewrite, the chosen claim language." SuperGuide Corp. v. DirecTV Enters., Inc., 358 F.3d 870, 875 (Fed. Cir. 2004).

Finally, a court should consider the patent's prosecution history, which consists of "the complete record of proceedings before the [USPTO] and includes the prior art cited during the examination of the patent." Phillips, 415 F.3d at 1317. Such proceedings can "inform the meaning of the claim language[,]" but often lack "the clarity of the specification" and thus typically prove "less useful for claim construction purposes." Id.

If, however, the intrinsic evidence fails to disclose the meaning of a term, the Court may examine extrinsic evidence to determine the meaning of particular terminology to those of skill in the art of the invention. Id. at 1318. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. The Federal Circuit cautions, however, that "heavy reliance on [a] dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular

context, which is the specification." Id. at 1321.
Consequently, as with patent prosecution history, extrinsic
evidence often possesses minimal weight in claim construction.

In utilizing the myriad resources for claim construction,
courts should remain mindful of "the flaws inherent in each type
of evidence and assess that evidence accordingly." Phillips, 415
F.3d at 1319.  Moreover, the Federal Circuit advises that
"'[t]he construction that stays true to the claim language and
most naturally aligns with the patent's description of the
invention will be, in the end, the correct construction.'" Shire
Dev., LLC v. Watson Pharms., Inc., 746 F.3d 1326, 1330 (Fed.
Cir. 2014) (quoting Phillips, 415 F.3d at 1316).  Mindful of the
standards applicable to claim construction, the Court turns to
the disputed terms in this instance.

## IV. CONSTRUCTIONS

### A. The meaning of "ventilation opening"

Plaintiff argues that the phrase "'ventilation opening"
should be construed as "a hole which allows the free passage of
air.'"  (Pl.'s Br. at 5.)  Defendant counters that the inclusion
of "ventilation" requires that the "opening" be "large enough to
allow sufficient free passage of air to ventilate the enclosed
space."  (Def.'s Br. at 22.)  In that regard, Defendant
construes "ventilation opening" as a functional limitation on
the claims, rather than a mere structural requirement (Pl.'s

9

Reply at 12-13), because an improperly sized opening would purportedly fail to confer in part the invention's claimed benefit (e.g., the ability to ventilate a crawl space).  (Def.'s Br. at 23.)

    In so arguing, however, Defendant injects a performance attribute to the ventilation opening that lacks support in the words of the claim, the specification, or the relevant prosecution history.  (See generally id.)  Specifically, Defendant misconstrues the significance of "ventilation[,]" which, rather than a limitation, provides an indication of the flood vent's purpose, e.g., to primarily vent foundational crawlspace depending upon outside air temperature.  The Patent, however, contains no indication that "ventilation opening" refers, definitionally, to an ability to vent only a particular quantum of air, as opposed to enabling the unobstructed passage of air.  Nor do the ordinary meanings of "ventilation"[1] and "opening"[2] compel any contrary conclusion.

    Rather, read in context, the clear and ordinary meaning of "ventilation opening" is "a hole which allows the free passage

---

[1] The Merriam-Webster's dictionary defines ventilation, in relevant part, as "a system or means of providing fresh air [.]" Merriam-Webster Online Dictionary, ventilation, available at http://www.merriam-webster.com/dictionary/ventilation.
[2] The Merriam-Webster's dictionary defines opening, in relevant part, as "a hole or empty space that you can go through [.]" Merriam-Webster Online Dictionary, opening, available at http://www.merriam-webster.com/dictionary/opening.

of air." See Markman, 517 U.S. at 389 ("[A claim] term can be defined only in a way that comports with the instrument as a whole."). Indeed, the specification squarely supports the construction of "ventilation opening" as allowing "the free passage of air." See Merck & Co. v. Teva Pharms. USA, Inc., 347 F.3d 1367, 1371 (Fed. Cir. 2003) ("[C]laims must be construed so as to be consistent with the specification, of which they are a part.").

The specification discloses that the vent, when installed, "allow[s] for the free passage of air ventilation in warm temperatures" and "will close fully in colder temperatures." ('445 Patent Cl. 2, ln. 64-67.) The specification further states that the vent "can remain open for regular air ventilation in warm weather conditions" and "can close to block off air flow during cold weather conditions[.]" (Id. at Col. 3, ln. 13-15.) The invention therefore provides a "method for integrating ventilation of an enclosed space" by "automatically opening the vents in response to warmer ambient temperatures, and automatically closing the vents in response to cooler ambient temperatures." (Id. at Col. 3, ln. 34-50.) The Claims, accordingly, disclose two vent positions relevant to the definition of "ventilation opening[:]" one being fully open to allow the unobstructed passage of air for the purposes of ventilation, and the other being fully closed to prevent any

flow of air.  (Id.; see also '445 Patent C1, Col. 2, ln. 35-37
(noting that the flood gate has "two open positions and a closed
position").)  Indeed, the relevant figure depicts the fully open
position as follows:



('445 Patent, Fig. 9.)  Given this context, no reasonable reader
could conclude that the invention's "ventilation opening"
enables only a "sufficient free passage of air."  Indeed, the
Patent contains no support for any quantitative or functional
limitation on the amount of air that passes through the
ventilation opening.  Rather, the Patent, and specifically the
Claim itself, only discloses a sufficiency aspect with respect
to the pressure valve on the claimed invention.  ('445 Patent,
Col. 3, ln. 23-28 (discussing the minimum level of water

pressure to trigger the automatic venting through the crawl space); '445 Patent C1, Col. 2, ln. 30-47.)  Otherwise, however, the claimed invention reflects that the ventilation opening enables the free passage of air, in order to account for fluctuations in ambient temperatures.  ('445 Patent, Col. 3, ln. 34-50.)

Consequently, as used in the Patent, and consistent with the ordinary meanings of "ventilation" and "opening," a "ventilation opening" means "a hole which allows the free passage of air."

**B. The meaning of "screen"**

Plaintiff maintains that the term "screen" should be construed as "a structure having holes which are small enough to prevent penetration by small animals, insects and other pests, and which are large enough to permit airflow."  (Pl.'s Br. at 7.)  Defendant only challenges this definition to the extent it asserts that the "screen" must be a "mesh structure . . .[,]" rather than merely a "structure . . ."  (Def.'s Br. at 20-22.) In so arguing, Defendant, relying solely upon the figures appended to the specification and one prior art reference, asserts that the term "'screen'" must be construed as being comprised of "mesh" comparable to that of an ordinary household window screen in order to make clear that such screens block all insects. (Id. at 21 (citation omitted).)

13

However, the clear and ordinary meaning of "screen" in the context of the '445 Patent fails to support Defendant's "mesh" limitation.  (Id.)  Importantly, the Patent nowhere limits the vent's screen construction to "mesh[,]" nor does the Patent compare the screen's structure to that of an ordinary household window.[3]  Rather, the '445 Patent reflects that the screen is composed of stainless steel or aluminum ('445 Patent, Col. 4, ln. 31-32; Col. 5, ln. 11-12), and "is configured to deny small animals and insects access" to the foundational crawlspace.[4] ('445 Patent C1, Col. 1, ln. 57-60.)

The only reference to a "mesh" structure arises in a context unconnected to the screen's structure.  Specifically, in the preferred embodiment, the Patent describes the flood vent's "grille" as comprised of "a honeycombed-patterned mesh."  ('445 Patent, Col. 4, ln. 31-33.)  In that regard, the inventor's inclusion of "mesh" as an adjective describing the "grille" of

---

[3] Nor does the intrinsic evidence otherwise reflect the relevant artisan's understanding of the "screen."

[4] At the Markman hearing, counsel for Defendant argued that the claimed food vents must be construed to block all insects in order to account for the vent's use in household living spaces. In so arguing, counsel does not rely upon any language found in the claims or the specification.  Rather, counsel points to screenshots of a video advertisement that appear to depict the flood vent being used in a household living space.  The Court, however, finds such assertion without support in the Patent itself.  Indeed, the Patent itself is replete with references to the vent's placement in foundational crawlspace ('445 Patent, Col. 2, ln. 40-54, 61-62, Col. 3, ln. 17), but nowhere discloses the vent's alleged suitability for household living spaces.

14

the flood vent, but not the vent's screen, belies Defendant's
assertion that the screen should likewise be limited to a mesh
structure.  ('445 Patent, Col. 4, ln. 31-33.)

Moreover, despite Defendant's arguments, the figures set
forth in the specification do not prove dispositive of the
term's construction.  Notably, though the Court must, in
construing claim language, examine a patent's written
description and drawings, the Court may not read limitations
"into the claims from the written description."  Anchor Wall
Sys., Inc. v. Rockwood Retaining Walls, Inc., 340 F.3d 1298,
1306 (Fed. Cir. 2003) (citation omitted).  "Similarly, the mere
fact that the patent drawings depict a particular embodiment of
the patent does not operate to limit the claims to that specific
configuration."  Id. at 1306-07 (citing Hockerson-Halberstadt,
Inc. v. Avia Group Int'l, Inc., 222 F.3d 951, 956 (Fed. Cir.
2000)).  Consequently, even if the figures could be construed as
depicting a mesh screen, the Court could not rely upon such
depictions to find the term "screen" limited to a "mesh
structure[,]" given the absence of any claim language that
supports such limitation.

Consequently, as used in the Patent, and consistent with
its ordinary meaning, "screen" means "a structure having holes
which are small enough to prevent penetration by small animals,

15

insects and other pests, and which are large enough to permit
airflow."

### C. The meaning of "width and height of a standard concrete masonry unit (CMU)"

Plaintiff's argument concerning the construction of "width
and height of a standard concrete masonry unit (CMU)" is two-
fold: first, Plaintiff argues that the term should be construed
in accordance with industry standard, without reference to
specific dimensions; in the alternative, and while maintaining
that the construction of the term requires no specific size
range, Plaintiff contends that the relevant artisan would
understand that the "width and height of a standard concrete
masonry unit (CMU)" could "be as narrow as approximately 7 ½" by
16 ½", and as large as approximately 8 ⅜" by 16 ⅜"[.]"  (Pl.'s
Br. at 13.)  In so arguing, Plaintiff contends that "the claims
and specification" provide ample context "for a person of
ordinary skill" to understand that the flood vent "would readily
fit into the opening created by the removal" of a CMU and the
surrounding mortar, particularly given the vent's intended use
"in new construction and in renovations."  (Id.; see also Pl.'s
Reply at 9-10.)  Defendant, relying upon the Patent's
description of its preferred embodiment, certain portions of the
reexamination history, and the absence of any qualifiers (like,
"about" or "approximately") in connection with the Patent's

16

dimensional language, argues that a "CMU" and "standard CMU" should be construed "as having a [fixed] height of 8" and a width of 16", and 'two CMUs' as having a [fixed] height x width of 16" x 16"."[5]  (Def.'s Br. at 16-17.)

Despite their various arguments, the parties essentially agree on the numerical dimensions to be ascribed such phrase, both arguing that the height and width of a standard CMU should be defined as 8" by 16".  (Pl.'s Br. at 8 ("the term 'standard concrete masonry unit' in Claims 12 and 15 is a shorthand of that which is already inherent in a patent – a CMU of the 8" x 16" variety"); Def.'s Br. at 13 ("the only clear expression of the dimensions for the width and height of one CMU in the '445 patent point to 16" and 8").)  The parties dispute, however, the manner in which to interpret such dimensions, with Plaintiff arguing that such reference incorporates the nominal dimensions

---

[5] Defendant also challenges Plaintiff's proposed constructions on the basis that Plaintiff's original disclosure (from the 1980s) purportedly fails, in part, to support Plaintiff's proposed constructions in connection with the pending submissions.  (See, e.g., Def.'s Br. at 8-15.)  The Court, however, finds Defendant's argument premature because, whatever the merits, a determination of validity under 35 U.S.C. § 112, paragraph 1, constitutes an issue of fact, and is therefore inappropriate for determination in connection with this claim construction proceeding.  McGinley v. Franklin Sports, Inc., 45 F. Supp. 2d 1141, 1144-45 (D. Kan. 1999) (finding defendant's argument that the original disclosure was not broad enough to support plaintiff's proposed constructions inappropriate for consideration in a Markman proceeding) (citing Tronzo v. Biomet, 156 F.3d 1154, 1158 (Fed. Cir. 1998); Gentry Gallery, Inc. v. Berkline Corp., 134 F.3d 1473, 1479-80 (Fed. Cir. 1998), aff'd, 262 F.3d 1339 (Fed. Cir. 2001)).

of a standard concrete masonry unit, inclusive of a dimensional variance +/- ⅜", and with Defendant arguing that such reference clearly expresses the actual, or fixed, dimension of the disclosed concrete masonry unit.

Though the term is not a model of clarity, the Court finds that an individual skilled in the art would understand that the dimensional measurements of the claimed flood vent, namely, the reference to "width and height of a standard concrete masonry unit (CMU)," reflect that the invention would be used in place of, and sized concordant with, the concrete blocks that generally form foundational crawlspaces. As stated below, the Patent's reference to a "standard concrete masonry unit (CMU)" therefore incorporates a dimensional variance +/- ⅜" in order to account for the lack of complete uniformity in standard masonry units and the associated mortar joint, and to ensure a tight fit within the fluid passageway. The Court finds that Defendant's arguments to the contrary attempt to divorce the dimensional terms from their essential context.

The Patent discloses that the claimed invention "relates generally to crawl space and basement venting, and in particular, to the flood venting of enclosed spaces within a foundation." ('445 Patent, Col. 1, ln. 12-14.) The Patent therefore directs that the invention, a "maintenance free flood vent," be installed in the concrete blocks of "new and existing

crawl spaces" for "year round" ventilation. (Id. at Col. 2, ln. 60-62.)

In the preferred and alternative embodiments, the Patent generally states that the dimensions of the vent's outer frame equals that "of an 8" x 16" concrete masonry unit (CMU)[,]" with 16 ⅜" long top and bottom rails and 8 ⅜" long side rails.  (Id. at Col. 4, ln. 18-23, 63-67.)  In order to ensure a proper fit, the Patent further directs that the outer frame be secured by screws to the "wall opening" created by the removal of the CMUs, and directs that the "perimeter [] be caulked as required." (Id. at Col. 4, ln. 24-27, Col. 5, ln. 2-5.) The Patent, accordingly, claims in relevant part

> 15.  A flood gate for use in an enclosed spaced, the flood gate comprising:
> an outer frame having side walls defining a fluid passageway therethrough, wherein the outer frame has a width of a standard concrete masonry unit ( CMU), a height of one or two CMUs;
>
> . . .
>
> whereby tidal flood waters exceeding said minimum pressure level are automatically vented through said enclosed space reducing a risk of structural damage from said tidal flood waters.

('455 Patent C1, Col. 2, ln. 30 – Col. 3, ln. 19.)

The parties have agreed that "fluid passageway" should be construed for the purposes of claim construction as "the open area between the interior sides of the walls of the frame through which water can flow."  (Prehearing Statement [Docket

Item 107], 1.)  The parties, accordingly, agree that the outer frame of the flood vent sits flush with such "open area"—an open area entirely filed by the invention's outer frame.  In so agreeing, Defendant necessarily concedes that the claimed invention is sized to be a snug substitute for the concrete blocks (either one or two) that once comprised the open area. Indeed, the claim language itself dictates such conclusion by disclosing, contextually, and by its own terms, that the claimed invention bears dimensions equivalent to the concrete block(s) it replaces.  (See, e.g., ('455 Patent C1, Col. 2, ln. 30 – Col. 3, ln. 19.)  The specification then consistently directs that the perimeter be caulked, as required, in order to ensure an appropriate fit.  ('445 Patent, Col. 4, ln. 24-27, Col. 5, ln. 2-5.)

In that regard, the Patent refers to a "standard concrete masonry unit (CMU)" as industry shorthand for the nominal (or, variable), rather than actual (or, fixed), dimensions of such masonry blocks, because such term need not be defined by reference to specific dimensions.  Indeed, the claim itself nowhere specifies a precise dimensional limitation.  Rather, the claim and the specification make plain that an outer frame, or fluid passageway, with a width and height of a standard concrete masonry unit describes an object sized to replace a standard concrete block.

Moreover, despite the clarity of the Patent itself, the Court finds further support for this construction in the Patent's reexamination history and the BOCA regulations referred to in the specification.  In connection with the reexamination proceeding, the Patent Owner squarely stated that, the claimed flood vent is sized "to take the place of a concrete block" in an exterior wall, but did not disclose that such block solely arises in a fixed dimension.  (Burke Dec., Ex. D1 at 51, 82, 107-08.)

The commentary to the BOCA regulations similarly recognizes that a 8" by 16" CMU nominally references a CMU with actual dimensions of 7 ⅝" by 15 ⅝", with the differential intended to account for the typical ⅜" mortar joint, and pictorially represented as:



(Cleary Dec., Ex. D.)

The Patent's reference to a "standard concrete masonry unit" consistently recognizes this reality and, therefore, relies upon such phrase to incorporate the nominal dimensions of a masonry unit, mindful, as evidenced by the specification's reference to potentially necessary caulking, that a "typical" mortar joint may differ under certain circumstances.  The Court, however, finds the lower range of Plaintiff's proposed specification, a width of at least 15 ½" to about 16 ⅜", and a height of at least about 7 ½" to about 8 ⅜", without support in the Patent.[6]  (See, e.g., '445 Patent, Col. 4, ln. 21-23 (referring to a top and bottom rail of 16 ⅜", and a side rail of 8 ⅜"); Cleary Dec., Ex. D (referring to the "actual dimensions" of a concrete masonry unity as a length of 15 ⅝", a width of 7 ⅝", and a height of 7 ⅝").)  Rather, the Court finds the Patent supportive of dimensions consistent with the nominal dimensions of a standard concrete masonry unit, +/- a ⅜" mortar joint.

Consequently, as used in the Patent, the term "width and height of a standard concrete masonry unit (CMU)" therefore

---

[6] At the Markman hearing, counsel for Plaintiff argued that the BOCA regulations provide support for a construction that accounts for an additional ⅛" permissible variation in the size of a CMU.  The Court, however, finds Plaintiff's proposed construction in that respect overly reliant upon extrinsic evidence, and without corresponding support in the language of the Patent.  The Court finds, by contrast, support in the Patent's own terms for the inclusion of a ⅜" variance, an inclusion only further supported, but not entirely based upon, the extrinsic BOCA regulations.

refers to a concrete masonry unit with the following dimensions: 8" by 8" by 16", +/- a ⅜" mortar joint.[7]

### D. The meaning of "outer frame"

The parties' dispute concerning the construction of the "outer frame" similarly turns, in part, on the claimed invention's dimensions, and primarily concerns whether the "outer frame" includes the face plant, or front portion, as part of such frame. Plaintiff, relying upon the specification and certain portions of the prosecution history, argues that the "outer frame" constitutes the border that surrounds the fluid passageway, but does not include the flange or the face plate. (Pl.'s Br. at 18-21.) Defendant counters that such term must be defined to include the front portion or face plate, such that the front portion comprises "what gets measured to determine the height and width of the accused 'outer frame' when assessing infringement." (Def.'s Br. at 2.) In that regard, Defendant argues that the outer frame envelops not only the fluid passageway, but also "the outer periphery of the flood gate." (Id.) In so arguing, Defendant finds no support in the Claim's

---

[7] Having so concluded, and as discussed during the Markman hearing, the Court need not construe the additional and inextricably intertwined dimensional terms in dispute, namely, "height" and "width," particularly because the parties concede that the construction of such terms are non-dispositive and because such terms have otherwise been addressed by construction of this phrase. (See generally Prehearing Statement at 1.)

23

language, and relies instead upon the lead lines (labeled 110)
in the following depictions:



The Court, however, finds Defendant's proposed construction
overly reliant upon the Figures appended to the Patent, and
otherwise without sufficient support in the unambiguous Claim
language.  Indeed, the Claims nowhere define the outer frame to
incorporate the front portion or face plate.  To the contrary,

Claim 15 provides, in relevant part, that the claimed invention comprises "an outer frame having side walls defining a fluid passageway therethrough, wherein the outer frame has a width of a standard concrete masonry unit (CMU), [and] a height of one or two CMUs[.]" ('445 Patent C1, Col. 3, ln. 3-6.) As stated above, the parties stipulate that the term "fluid passageway" refers to the open area between the "<u>interior</u> sides of the walls" and the Court has relatedly construed the dimensional limitations associated with the phrase "standard concrete masonry unit (CMU)" as enveloping the entirety of that interior space. (Prehearing Statement at 1 (emphasis added).)  The proper construction of "outer frame" therefore flows directly from this context.

Defendant's position to the contrary, though rooted in common sense and reliant upon consecutive visual depictions, would result in a construction without support in the Claims of the Patent itself.  Indeed, the specification makes clear that the face plate of the claimed invention attaches to the <u>exterior</u> wall of the structure to which the vent is attached ('445 Patent, Col. 4, ln. 24-25), but has no impact on the fluid passageway (or, <u>interior</u> wall) that defines the outer frame. ('445 Patent C1, Col. 3, ln. 3-12.) In that regard, the Court may not read limitations "into the claims from the written description." <u>Anchor Wall Sys., Inc.</u>, 340 F.3d at 1306

(citation omitted).  Nor can "the mere fact that the patent
drawings depict a particular embodiment of the patent" operate
"to limit the claims to that specific configuration."  <u>Id.</u> at
1306-07 (citation omitted).[8]

Consequently, as used in the Patent, the "outer frame"
means, as argued by Plaintiff, the border that surrounds the
fluid passageway, in which the door is mounted, but excluding
the face plate or front portion.

**E. The meaning of "door"**

The parties primarily dispute the construction of "door" in
one narrow respect, namely, whether the term, by definition,
incorporates the "pull tabs" that enable the door to be opened
and closed.  Plaintiff, relying upon the Claims and the
specification, argues that the "pull tabs" constitute an
attachment, as opposed to a required component, of the flood
vent's door.  (Pl.'s Reply at 2-3.)  Defendant counters that the
visual depictions of the claimed invention, coupled with the
Claim's indication that the "door is recessed," compel the
conclusion that the pull tabs instead act as critical components
of the door.  (Def.'s Br. at 19-20.)

Resolution of this dispute does not require complex
construction.  Claim 15 discloses that the invention bears "a

---

[8] Having so construed, the Court need not construe "front" and
"back" at this time.

26

door pivotally mounted ... for bidirectional rotation between two open positions and a closed position ... wherein the door is recessed from the front and back of the outer frame." ('445 Patent C1, Col. 3, ln. 7-11.) The Claim, by its very terms, therefore recognizes the door's fundamental purpose: its ability to pivot between open and closed positions. (Id.) The specification then describes the "components of the door" as "a honeycomb-patterned mesh grille backed by screening" with a "pair of opposing pull tabs [] attached to the mesh grille." ('445 Patent, Col. 4, ln. 28-34, Col. 5, ln. 7-11 (emphasis added).) By stating that the "mesh grille" comprises a component of the door, and that a "pair of opposing pull tabs" are attached to this component, the terms of the Patent necessarily recognize that the pull tabs constitute a fundamental component of the door, without which it could not function as intended. The Court therefore reject Plaintiff's assertion that such a construction improperly incorporates a limitation from the specification into the Claim's interpretation. (See Pl.'s Reply at 1-2.) To the contrary, such construction is consistent with the Claim's language, particularly because the pull tabs enable, in accordance with the Claim, the door's functional features (i.e., to enable the door to act as a movable barrier for "bidirectional rotation"). (See '445 Patent C1, Col. 3, ln. 7-11.)

The Figures then lend further support for this construction, by depicting "the components of the door" in the preferred and alternative embodiment, inclusive of the pull tabs, as follows:



The Court accordingly construes such term, consistent with its ordinary meaning, by reference to its intended purpose: providing a mechanism to open and close the flood vent.  Absent such "pull tabs," the flood vent's door would provide no such mechanism, nor the disclosed bidirectional rotation.

Consequently, as used in the Patent, and consistent with its ordinary and customary meaning,[9] "door" means "a movable

---

[9] The Merriam-Webster's dictionary defines a door, in relevant part, as a "a usually swinging or sliding barrier by which an entry is closed and opened[.]"  Merriam-Webster Online Dictionary, door, available at http://www.merriam-webster.com/dictionary/door. The Court therefore agrees with Plaintiff that the "door" is a barrier, rather than any structure.  (See Pl.'s Br. at 9.)

barrier which can open and close, including pull tabs and a honeycomb-patterned mesh grille backed by screening."[10]

## V.    CONCLUSION

No reasonable reader of ordinary skill in the art can examine this patent and understand the disputed terms to mean anything other than the meanings ascribed herein.  An accompanying Order will be entered.


__December 3, 2014__                          __s/ Jerome B. Simandle__
Date                                      JEROME B. SIMANDLE
                                          Chief U.S. District Judge

---

[10] The Court need not construe the term "recessed," because the parties agreed during the <u>Markman</u> hearing that this term requires no construction, as it means "set inwardly from the front and the back."