IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

SMART VENT, INC.,

              Plaintiff,

     v.

USA FLOODAIR VENTS, LTD.,

              Defendant.

HONORABLE JEROME B. SIMANDLE

Civil Action No.
10-168 (JBS/KMW)

**OPINION**

APPEARANCES:

Anthony J. DiMarino, III, Esq.
Emmett S. Collazo, Esq.
A.J. DIMARINO, III, PC
57 Euclid Street, Suite A
Woodbury, NJ 08096
    Counsel for Plaintiff

Robert Mahoney, Esq.
NORRIS, MCLAUGHLIN & MARCUS, PC
721 Route 202 206
PO Box 5933
Bridgewater, NJ 08807
    -and-
Daniel P. Burke, Esq.
DANIEL P. BURKE & ASSOCIATES, PLLC
240 Townsend Square
Oyster Bay, NY 11788
    Counsel for Defendant

**SIMANDLE, Chief Judge:**

## Contents

I.    INTRODUCTION............................................. 2

II.  FACTUAL AND PROCEDURAL BACKGROUND....................... 10

  A.  The NFIP Regulations on Flood Vents ................... 10

  B.  FEMA Technical Bulletin 1, or TB-1 .................... 12

  C.  Smart Vent's Flood Vent and its ICC-ES Evaluation Report 16

D.   USA Floodair's Flood Vent and its Individual Certification Process ...................................................... 18

E.   Litigation in this District and Markman Decision ....... 23

III.   PRELIMINARY ISSUES ..................................... 25

A.   Admissibility of Coulbourne Report .................... 26

1.   Daubert Standard ..................................... 26

2.   Mr. Coulbourne's Report is Admissible ................ 28

B.   The Parties' Stipulation on the term "Recessed" ....... 34

C.   Admissibility of the Supplemental Declarations of Diane Bergaglio and Neil Opatkiewicz ............................. 37

IV.   STANDARD OF REVIEW APPLICABLE TO THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT........................................ 40

A.   Summary Judgment, Generally ........................... 40

B.   Patent Infringement Standard .......................... 42

V.   DISCUSSION............................................... 45

A.   Patent Infringement Issues ............................ 45

1.   Factual Issues Preclude Summary Disposition of the Parties' Positions on Literal Infringement of the Claim Term "Outer Frame" ............................................ 46

2.   USA Floodair's Product Literally Infringes the Construed Claim Term "Door" ........................................ 51

B.   Unfair Competition Issues ............................. 57

VI.   CONCLUSION.............................................. 64

## I.   INTRODUCTION

In this patent infringement and unfair competition action, Plaintiff Smart Vent, Inc. (hereinafter, "Plaintiff" or "Smart Vent"), advances its position that the distribution of Defendant USA Floodair Vents, Ltd.'s (hereinafter, "Defendant" or "USA Floodair") "certified" flood vents infringes the patent covering

Smart Vent's NFIP-certified[1] foundational flood vent, U.S. Patent No. 5,944,445 (hereinafter, the "'445 patent" or the "original Patent"), as amended during ex parte reexamination (hereinafter, the "'445 C1 patent" or the "Patent"), **and** amounts to <u>unfair competition</u> because USA Floodair "falsely" advertises its vents as FEMA, ICC, and NFIP-certified.[2]

Smart Vent's Patent generally describes a "maintenance free flood vent" that "can be installed in new and existing crawl spaces and foundations," that "can remain in use year round," and that can be used for "air ventilation" and as an "opening for the [pressure-sensored] entry and exit of tidal flood waters." ('445 Patent at 2:57-62.) The flood vent taught by the asserted claims, in turn, consists of an (1) "outer frame

---

[1] The NFIP, or National Flood Insurance Program, "enables property owners in participating communities to purchase flood insurance" at discounted rates in exchange for compliance with "State and community floodplain management regulations that seek to reduce future flood damage." (Compl. at ¶ 9.)  As relevant here, these regulations require that foundational flood vents meet certain criteria based upon the square footage of the crawlspace and the structure of the foundation, among other factors. (<u>Id.</u> at ¶ 11.)

[2] In the aftermath of Defendant's request for reexamination of claims 1-11 of the '445 patent, the U.S. Patent & Trademark Office (hereinafter, the "PTO") cancelled claims 2 and 7 of the original Patent, amended claims 1, 3, 4, 5, 6, and 8, and added claims 12-15.  See <u>Smart Vent, Inc. v. USA Floodair Vents, Ltd.</u>, No. 10-168 JBS, 2014 WL 6882281, at *1 (D.N.J. Dec. 3, 2014), <u>on reconsideration in part</u>, 2015 WL 5009213 (D.N.J. Aug. 21, 2015). Given that the asserted claims flow from the added claims on the reexamination certificate, the Court will, in the interests of simplicity, refer to the reexamined patent, the '445 patent C1, as the '445 patent.

... defining a fluid passageway ... [with] a width of a standard concrete masonry unit (CMU) [and] a height of one or two CMUs," (2) "a door pivotally mounted ... for bidirectional rotation between two open positions and a closed position ... to permit tidal water flow," and (3) "at least one catching assembly for holding the door in [a] closed position against a minimum level of [water] pressure." (Id. at 3:1-15.)

The advertisements for the foundational flood vent produced by USA Floodair similarly describe a vent that "provides air ventilation in a crawl space to increase air flow [all] while providing flood protection." (Ex. G to Coulbourne Dec.) The USA Floodair flood vent itself then "fits into an opening the size of a regular concrete block," and consists of an (1) "outer frame" with the dimensions of 10" x 18", (2) a "perforated door," and (3) "[e]ngineered openings ... designed to provide the equalization of hydrostatic flood forces on exterior walls by allowing for the automatic entry and exit [of] floodwaters." (Id.)

Following a lengthy period of pretrial discovery, the parties now cross-move for summary judgment on the issues of infringement and unfair competition [see Docket Items 141 &

153],[3] but agree that the disposition of the infringement portion of this litigation turns, in its entirety, upon whether the flood vent of USA Floodair meets (literally or equivalently) two limitations in claim 15 of the '445 patent.[4] (See, e.g., Def.'s Br. at 1-2, 8-18; Pl.'s Opp'n at 6-22; Def.'s Reply at 1-3.) More specifically, resolution of the infringement aspect of this case hinges upon whether USA Floodair's flood vent contains (1) an "outer frame" within the construed dimensional ranges, and (2) a "recessed ... door" of the sort described by the '445 patent and construed by this Court in its Markman decision. See Smart Vent, Inc. v. USA Floodair Vents, Ltd., No. 10-168, 2014

---

[3] In addition, USA Floodair moves to strike the declaration of Smart Vent's infringement and engineering expert on the grounds discussed below. [See Docket Item 158.]

[4] In other words, the parties substantively agree that USA Floodair's accused product meets all elements of claim 15, other than the "outer frame" and "door" limitations, and only argued these limitations throughout their voluminous summary judgment submissions. Despite this agreement, during oral argument, USA Floodair argued, for the first time, that the claim term "screen" provides an additional infringement issue in this action. Nevertheless, USA Floodair made no mention of this claim term in its summary judgment briefing (see generally Def.'s Br.; Def.'s Reply), nor identified this claim term in its non-infringement contentions (which it last updated in October 2015). (See Ex. S to DiMarino Dec. (reproducing USA Floodair's "UPDATED, POST REEXAMINATION NONINFRINGEMENT CONTENTIONS AND RESPONSES," and arguing non-infringement of the claim terms "outer frame" and "door").) As a result, USA Floodair has waived any non-infringement argument relative to the term "screen." See L. Pat. R. 3.7; see also LMT Mercer Grp., Inc. v. Maine Ornamental, LLC, No. 10-4615, 2014 WL 284238, at *5-*8 (D.N.J. Jan. 24, 2014) (describing the framework for amending contentions under the Local Patent Rule 3.7).

WL 6882281, at *1 (D.N.J. Dec. 3, 2014), on reconsideration in part, 2015 WL 5009213 (D.N.J. Aug. 21, 2015) (collectively, the "Markman decision").[5]

In resolving these issues, however, the parties advance diametrically opposed positions.  USA Floodair, on the one hand, takes the position that its product stops short of any literal infringement, because (1) the dimensions of its outer frame differ from the construed dimensional ranges of the '445 patent, and (2) because the pull tabs of its door "always" protrude "outwardly beyond the front or the back of the outer frame," rather than being fully "recessed" inwardly from the outer frame.  (Def.'s Br. at 10-12; Def.'s Reply at 6-22.)  Beyond that, USA Floodair claims that the circumstances of the reexamination precludes Smart Vent from relying upon doctrine of equivalents infringement.  (See generally id.)  Smart Vent, by contrast, advances the view that USA Floodair's product literally infringes the "outer frame" and/or "door" limitations of the '445 patent, (1) because the outer frame of the accused device squarely matches the construed dimensions of the patented invention, and (2) because the door sits inwardly from the outer

---

[5] On reconsideration, the Court narrowed, slightly, its initial construction of the claim terms "width and height of a standard concrete masonry unit (CMU)" and "door."  See Smart Vent Inc. v. USA Floodair Vents, Ltd., No. 10-168, 2015 WL 5009213 (D.N.J. Aug. 21, 2015).

frame and only protrudes because of USA Floodair's inclusion of "excessively large pull tabs." (Pl.'s Opp'n at 8-22.)

Turning then to the unfair competition aspect of this litigation, the parties again put forth widely disparate positions. USA Floodair, for its part, argues that Smart Vent cannot demonstrate any unfairness in its "certified" vent claims, because "licensed, professional engineers" have confirmed that the vents "exceed the [actual] requirements of the NFIP," as well as the related technical bulletins. (Def.'s Reply at 25-27.) Smart Vent, by contrast, takes the view that USA Floodair's advertisements of "FEMA, ICC and NFIP State Engineered Certified Complaint Vents" plainly violate federal and state unfair competition laws, because the relevant regulations require an Evaluation Report issued by the International Code Council Evaluation Service (hereinafter, an "ICC-ES Evaluation Report"), not an individual certification in the form provided by USA Floodair. (Pl.'s Opp'n at 28-33.)

In order to place the parties' positions in the proper context, the Court notes that the language of claim 15 recites, in relevant part, a "flood gate for use in an enclosed space" that includes:

> an **outer frame** having side walls defining a fluid passageway therethrough, wherein the outer frame has a width of a standard concrete masonry unit (CMU), a height of one or two CMUs;

> a **door** pivotally mounted in said frame for
> bidirectional rotation between two open positions and
> a closed position therebetween to permit tidal water
> flow therethrough, <u>wherein the door is recessed[6] from
> the front and back of the outer frame</u>, and includes a
> ventilation opening.

('445 patent at 3:1-11 (emphases added).)   In construing this

asserted claim, the Court reached, in relevant part, the

following constructions:

| Term | Claim Construction |
|---|---|
| **"width and height of a standard concrete masonry unit (CMU)"** | 8" by 16", +/- a 3/8" mortar joint. |
| **"outer frame"** | the border that surrounds the fluid passageway, in which the door is mounted, but excluding the face plate or front portion. |
| **"door"** | a movable barrier which can open and close, including pull tabs and a grille pattern backed by screening |

---

[6] The Court did not, however, construe the term "recessed," because the parties agreed during the Markman hearing that the term required no construction, and instead meant "'set inwardly from the front and the back.'"  Smart Vent, Inc., 2014 WL 6882281, at *11 n.10.  Indeed, during the Markman hearing, counsel for Plaintiff specifically proposed that "recessed" be defined as "set inwardly from" the front and the back of Smart Vent's patented flood vent—a definition the Court adopted with the consent of the parties.  (Markman Tr. at 53:6-55:2.) Nevertheless, in the wake of the Markman hearing (at which time Smart Vent placed emphasis on the parties' agreement on the term "recessed"), USA Floodair filed a letter, claiming that it made no concession on the meaning of the term "recessed," and requesting that this Court's nearly two-year old Markman decision "be amended to correct [a] clerical error" concerning the meaning of the term "'recessed.'"  [Docket Item 175.]  The Court, however, finds the position of USA Floodair without merit for the reasons discussed below.

Against that backdrop, in resolving the parties' cross-motions for summary judgment, the Court must address two distinct series of questions. **First**, as to the infringement aspects of this action, the Court must determine whether the undisputed evidence demonstrates only one conclusion regarding infringement, namely, that USA Floodair's flood vent product meets the construed claim limitations "outer frame" and/or "door." **Second**, the Court must, through the prism of a two-part inquiry, consider whether USA Floodair's flood vent satisfies regulatory requirements for NFIP-certified flood vents. More specifically, the Court must determine whether the NFIP regulations and related technical bulletins permit an individual certification of compliance (the position advanced by USA Floodair), or narrowly require only an ICC-ES Evaluation Report (the competing position staked out by Smart Vent). From that conclusion, the Court must go on to consider whether a triable issue exists on Smart Vent's claim that USA Floodair "falsely" and/or "misleadingly" advertised its flood vents as FEMA, ICC, and NFIP-certified.

For the reasons that follow, Smart Vent's motion for summary judgment will be granted in part and denied in part on the issue of infringement and granted in part and denied in part on the issue of unfair competition. USA Floodair's motions for

summary judgment and to strike will, by contrast, be denied in their entirety.[7]

## II.  FACTUAL AND PROCEDURAL BACKGROUND[8]

### A.  The NFIP Regulations on Flood Vents

In 1968, Congress enacted the National Flood Insurance Program (hereinafter, the "NFIP") as part of the National Flood Insurance Act, 42 U.S.C. §§ 4001-4131 (hereinafter, the "NFIA"), in order to provide previously unavailable flood insurance protection to property owners in flood-prone areas.  (See generally Pl.'s SMF at ¶¶ 13-15; Def.'s RSMF at ¶¶ 13-15.)  More specifically, the NFIA authorized the Federal Emergency Management Agency (hereinafter, "FEMA") "to establish and carry out a [unified and subsidized] national flood insurance program" that would allow "interested persons to purchase insurance" against any losses "arising from any flood occurring in the

---

[7] The Court conducted oral argument upon the pending motions on May 19, 2016, at which time the Court received a model of USA Floodair's vent as an exhibit (hereinafter, "Def.'s Ex. 1").

[8] The Court distills this undisputed version of events from the parties' statements of material facts, affidavits, and exhibits. The Court disregards, as it must, those portions of the parties' statements of material facts that lack citation to relevant record evidence (unless admitted by the opponent), contain improper legal argument or conclusions, or recite factual irrelevancies.  See generally L. Civ. R. 56.1(a); see also Kemly v. Werner Co., ___ F. Supp. 3d ____, 2015 WL 8335030 (D.N.J. Dec. 8, 2015) (disregarding portions of the parties' statements of material facts on these grounds); Jones v. Sanko Steamship Co., Ltd., ___ F. Supp. 3d ____, 2015 WL 8361745 (D.N.J. Dec. 8, 2015) (same).

United States." 42 U.S.C. § 4011(a).  In other words, the NFIA designated FEMA as the administrator of the NFIP program, and vested it with the authority to develop and promulgate regulations relative to flood plain management criteria.  See, e.g., 42 U.S.C. § 4014.

As relevant here, in order to qualify for the federally-subsidized flood insurance, the NFIP regulations enacted by FEMA impose an array of structural requirements on (1) new residential construction, (2) the repair of substantially damaged buildings, and (3) the improvement of existing buildings in flood hazard areas.  (See Ex. H to Graham Dec.)  More specifically, these regulations

> [r]equire, for all new construction and substantial improvements, that fully enclosed areas below the lowest floor that are ... subject to flooding ... **be designed to automatically equalize hydrostatic flood forces on exterior walls by allowing for the entry and exit of floodwaters.**

44 C.F.R. § 60.3(c)(5) (emphasis added).  In other words, the regulations require that foundational spaces (or, the lower levels of dwellings) have flood vents that permit the automatic entry and exit of water.  See id.  The "designs" for these flood vents must, in turn,

> **either be certified by a registered professional engineer or architect or meet or exceed the following minimum criteria: A minimum of two openings having a total net area of not less than one square inch for every square foot of enclosed area subject to flooding shall be provided.**

44 C.F.R. § 60.3(c)(5) (emphasis added).  Thus, the NFIP regulations require, on their face, <u>only</u> a certification of compliance with net area requirements.  <u>See</u> <u>id.</u>

**B.   FEMA Technical Bulletin 1, or TB-1**

In its capacity as administrator of the NFIP, in August 2008, FEMA published a Technical Bulletin,[9] "Openings in Foundation Walls and Walls of Enclosures Below Elevated

---

[9] Although the parties extensively rely upon the requirements identified in TB-1 and attempt at least to operate within its tenets, USA Floodair disputes whether the technical bulletin carries with it the force of law.  (<u>See</u> Def.'s SMF at ¶ 32 ("FEMA technical bulletins do not create regulations.").)  Smart Vent argues, by contrast, that the interpretation FEMA offers of its own regulations in TB-1 "provides legal requirements." (Pl.'s RSMF at 7 32.)  Smart Vent's argument, however, misses the mark, because TB-1 states, on its face, that it does "not create regulations" and instead provides only "specific guidance for complying with the requirements of existing NFIP regulations." (Ex. H to Graham Dec. at 28.)  TB-1 then directs "[u]sers" to consult, if necessary, the <u>actual</u> legal requirements of the NFIP under 44 C.F.R. § 60.3.  (<u>Id.</u>)  In other words, the guidance provided in TB-1 provides only FEMA's persuasive interpretation of the NFIP, but stops short of creating new legal requirements or otherwise heightening the regulations expressed in 44 C.F.R. § 60.3.  As a result, Smart Vent cannot point to TB-1 as a controlling regulation, nor can the Court find USA Floodair in breach of the NFIP solely on account of its failure to follow TB-1's guidance, because TB-1 directs itself only to guidance, not binding requirements. Stated differently, the Court cannot find anything false or misleading in USA Floodair's advertisement of an NFIP-compliant flood vent, simply because its vents fall short of the guidance provided in TB-1, because its certification process otherwise comports with the limited facial requirements of 40 C.F.R. § 60.3(c)(5). That determination, however, leaves unresolved the question of whether USA Floodair "falsely" or "misleadingly" advertised its products as TB-1 compliant—a circumstance that, in turn, provides the basis, at least in part, of Smart Vent's unfair competition claims.

Buildings in Special Flood Hazard Areas in accordance with the"
NFIP" (hereinafter, "TB-1"), in an effort to "explain[] the NFIP
requirements for flood openings and [to] provide[] guidance for
prescriptive (non-engineered) and engineered openings."[10]  (Ex. H
to Graham Dec. at 1.)

More specifically, TB-1 provides further detail and
guidance concerning the certification process contemplated by
the NFIP regulations, and states that "engineered openings,"[11] as
here, may be certified through an "individual certification" or
an "Evaluation Report issued by the ICC-ES."[12]  (Ex. H to Graham
Dec. at 24-25.)

---

[10] TB-1 replaced Technical Bulletin 1-93, a similar FEMA
instructional guide entitled "Openings in Foundation Walls."
(Ex. H to Graham Dec.)
[11] An "engineered" flood opening activates, or opens and shuts,
against rising pressure in order to equalize hydrostatic loads.
(Ex. H to Graham Dec. at 31.)  A "non-engineered" flood opening,
by contrast, has no automated mechanism, and serves only "to
satisfy the prescriptive requirement that calls for 1 square
inch of net open area for each square foot of enclosed area."
(Id. at 20, 31.)  In other words, these "non-engineered" flood
openings can be as simple as "omitted blocks" or a permanent
hole in a foundational wall.  (Id. at 21-23, 31.)  The flood
vents at issue in this litigation both constitute "engineered
openings," because Smart Vent and USA Floodair each designed
their product to automatically vent tidal waters.
[12] The ICC-ES, a subsidiary of the International Code Council®,
evaluates, tests, and certifies the code compliance of flood
vents, among other products.  (See Pl.'s SMF at ¶¶ 58-59, 63,
77; see also Ex. D to Graham Dec. (describing the testing and
performance requirements for code-compliant flood vents, and
identifying the ICC-ES as a "subsidiary" of the ICC).

With respect to the individual certification process, TB-1 explains that "building designers or owners may ... use unique or individually designed openings or devices."[13]  (Id. at 24.)

---

[13] USA Floodair reads the language of TB-1 permissively to allow individual certifications for any engineered openings.  (See Def.'s SMF at ¶¶ 22-23.)  More specifically, USA Floodair points to a broad statement which explains that the certification of engineered openings **may take the form of the individual certification described above, or ... an Evaluation Report issued by the ICC-ES.**  (Id. at ¶ 22 (emphasis in original).)  Smart Vent, by contrast, reads the requirements of TB-1 more narrowly to permit individual certifications only for "'unique' or 'individually designed' flood vents, not mass-produced flood vents."  (Pl.'s RSMF at ¶ 23.)  In reviewing these positions, the Court notes, at the outset, that USA Floodair's position cites to, but ignores, the qualifying language as **"described above"** and then the explanatory disclosures to which that language points.  (Def.'s SMF at ¶ 22 (emphasis in original).)  Indeed, in the explanatory section of **"Engineered openings with individual certification[s]**," a/k/a the **"above"** section, TB-1 details the individual certification process only in connection with "unique or individually designed openings or devices," not in connection with mass-produced flood vents like those manufactured by USA Floodair.  (Ex. H to Graham Dec. at 24 (emphasis in original).)  Aside from that distinction, the individual certification process requires the design professional to "identify the [specific] building" in which the flood vent will be installed—presumably because the design professional uniquely or individually designed the opening for the particular structure.  (Id.)  The certification underpinning the ICC-ES Evaluation Report requires, by contrast, no indication of the specific installation address—presumably because the certification speaks to the overall capabilities of a type of opening, as opposed to the suitability of a specific flood vent for a particular foundational space.  Thus, although TB-1, at times, refers generically to an "individual certification" (without qualifying detail), the remainder of TB-1—and particularly the section specifically directed at explaining the individual certification process—makes clear that this alternative route to certification pertains only to specialized or uniquely-constructed flood vents.  (Id. at 24-25, 31.)  USA Floodair's statement (in at least one advertisement) concerning the compliance of its flood vents with TB-1 therefore

14

In such a scenario, a licensed design professional must (1) "identify the building in which the engineered openings will be installed," (2) certify that the flood openings "automatically equalize hydrostatic flood loads," (3) provide a description of the "range of flood characteristics" supported by the certification, and (4) note "the installation requirements or limitations that, if not followed, will void the certification."[14]  (Id. at 24.)

The ICC-ES Evaluation Report, by contrast, entails "technical evaluations of documentation submitted by the manufacturer, including technical design reports, certifications, and testing that demonstrate[s] code compliance and performance" for a particular type of engineered opening. (Id. at 25.)  The technical review is then buttressed by design certifications in the form described in the individual certification process, except that the certification need not include any particular installation address.  (See id.)

Under either path, TB-1 encourages "[c]areful attention to compliance with the NFIP regulations for flood openings,"

---

provides, as detailed below, the only basis for Smart Vent's unfair competition claim, because its individual certification fails to meet the requirements of TB-1.

[14] In addition, the certification must list the design professional's name, title, address, signature, licensing information, and must bear "the signature and applied seal of the certifying registered design professional."  (Ex. H to Graham Dec. at 24.)

because compliance influences "the vulnerability to flood damage and the cost of NFIP flood insurance." (Id. at 4.) For that reason, TB-1 directs consumers to closely inspect the requirements of 44 C.F.R § 60.3, and to "contact their NFIP state coordinator or the appropriate FEMA regional office" for any additional guidance. (Id. at 28.)

Against that regulatory backdrop, Smart Vent and USA Floodair both purport to produce competing NFIP-compliant flood vents. (Pl.'s SMF at ¶¶ 1, 3-5; Def.'s SMF at ¶¶ 1, 3-5.)

**C.   Smart Vent's Flood Vent and its ICC-ES Evaluation Report**

The '445 Patent, as explained above, describes a flood vent that serves as an air ventilation system and water pressure release mechanism for foundational crawlspaces. (See generally '445 patent at 2:57-3:50.)

The flood vent itself features an outer frame that rests within the interior sides of the foundational walls, and an automatic louver assembly that opens and closes in response to ambient temperatures and/or the pressure level associated with tidal flood waters. (Id. at 3:12-33.) In that way, the invention provides crawl space ventilation, all while reducing the risk of structural damage by allowing rising tidal waters to automatically vent through the crawl space when the water pressure exceeds a certain minimum threshold. (Id.)

16

The '445 patent, in turn, depicts the flood vent as follows:





('445 Patent.)  The commercially-produced flood vents then appear in the form reflected in the following graphic:



(Ex. G to Graham Dec.; Ex. B to DiMarino Dec.)

In order to demonstrate that its product complies with NFIP and FEMA regulations, and to allow its customers to avail themselves of discounts on their NFIP insurance, Smart Vent looks to the ICC-ES to produce an Evaluation Report.[15] (Pl.'s SMF at ¶¶ 58-59, 63, 77.)  In each Evaluation Report, the ICC-ES explains that the "automatic foundation flood vents" of Smart Vent underwent rigorous testing for compliance with various codes, and finds, on each occasion, that the flood vents meet the regulatory requirements.  (Ex. G to Graham Dec.)  Based upon these results, Smart Vent advertises its flood vents as "**FEMA ACCEPTED**," "**ICC-ES EVALUATED**," and indeed the "**Only Code Compliant Foundation Flood Vent**."  (Ex. B. to DiMarino Dec. (emphasis in original).)

**D.  USA Floodair's Flood Vent and its Individual Certification Process**

USA Floodair similarly touts the ability of its flood vent to regulate ambient temperatures in foundational crawlspaces, and to equalize the hydrostatic flood forces on exterior walls. (See Ex. Q to DiMarino Dec.; Ex. G to Coulbourne Dec.)  The vent itself then includes, much like Smart Vent's product, an "engineered" assembly that activates with the pressure of tidal

---

[15] The ICC-ES issued its first Evaluation Report on February 1, 2008, and then re-issued additional (but substantively identical) Reports on February 1, 2009, February 1, 2011, December 1, 2012, and February 1, 2015.  (See Exs. F & G to Graham Dec.; Pl.'s SMF at ¶¶ 73-75; Def.'s RSMF at ¶¶ 73-75.)

18

water flow (Ex. G to Coulbourne Dec.), comes fabricated in
aluminum (the FAAL model) and stainless steel (the FASS model)
forms, and appears in the following commercial form:

 

(Ex. Q to DiMarino Dec.)  USA Floodair's advertisements, in
turn, describe the dimensions of the flood vent as having a
**"Rough opening"** of 8" by 16",[16] an **"Outer frame"** of 10" by 18",
and an **"Inner frame"** of 7 $^{15}/_{16}$ by 15 $^{7}/_{8}$, and depicts the
dimensions of the actual flood vent (including the inner and
outer frame) as follows:[17]

---

[16] The rough opening refers to the block wall or concrete masonry
unit into which the flood vent will be installed.  (<u>See, e.g.</u>,
Ex. E to Coulbourne Dec. (depicting the rough opening).)
[17] As explained below, Smart Vent's expert, William Coulbourne,
P.E., disputes USA Floodair's dimensional calculations.  (<u>See</u>
Coulbourne Dec. at ¶¶ 26-29.)



(Exs. E, F, & G to Coulbourne Dec. (emphasis in original).)

In light of its design, structure, and function, USA Floodair claims that its flood vent "[m]eets FEMA, NFIP, ICC & ASCE requirements for engineered openings" and "can be certified by a state registered professional engineer" pursuant to TB-1.[18]

---

[18] USA Floodair advertises its flood vents, for example, using the following graphic:



(Exs. A & Q to DiMarino Dec.)

(Ex. Q to DiMarino Dec.; Ex. G to Coulbourne Dec.)  In other
words, USA Floodair's claim of an NFIP-compliant vent has
historically rested upon an individual certification, rather
than an ICC-ES Evaluation Report.  (Pl.'s SMF at ¶ 84; Def.'s
RSMF at ¶ 84; Ex. M to DiMarino Dec. (attaching various pre-May
2014 flood vent certifications).)  More specifically, when a USA
Floodair purchaser requested a flood vent certification for
insurance purposes, USA Floodair would "engage an individual
engineer" licensed in the relevant state "to prepare an
individual certification,"[19] in accordance with its
interpretation of the NFIP regulations and TB-1.  (Pl.'s SMF at
¶¶ 86-88; Def.'s RSMF at ¶¶ 86-88.)

In the wake of this litigation (which takes direct aim at
USA Floodair's claim of compliance), though, USA Floodair
adopted a new model certification process in March 2014 to
"assurance compliance" with regulatory requirements.  (Ex. G to
DiMarino Dec.)  More specifically, Neil Opatkiewicz of USA

---

[19] USA Floodair issued these certifications, at least in their
initial form, either by having "one of several engineers ...
retained for certification purposes" send a completed
certification directly to the requestor, or by completing one of
the blank, but pre-signed, certifications maintained in USA
Floodair's office.  (Pl.'s SMF at ¶¶ 89-90; Def.'s RSMF at ¶¶
89-90; see also Ex. M to DiMarino Dec. (attaching various pre-
May 2014 flood vent certifications).)  In order to demonstrate
compliance with the net area requirements of 44 C.F.R. §
60.3(c)(5), USA Floodair then separately provided the purchaser
with calculations on the square footage (i.e., net area) covered
by the flood vents.  (See, e.g., Ex. R to Supp. Opatkiewicz Dec.)

Floodair engaged Brandon Raudebaugh of Conn Engineering
Consultants, Inc. (hereinafter, "Conn Engineering") to develop a
"sample" certification that better aligned with the requirements
of TB-1.  (Ex. N to DiMarino Dec.; Pl.'s SMF at ¶ 93; Def.'s
RSMF at ¶ 93; Def.'s SMF at ¶ 30; Pl.'s RSMF at ¶ 30.)  These
"**Certification[s] of Engineered Flood Openings** *in accordance
with NFIP, FEMA Technical Bulletin 1-08 and ASCE/SEI 24-08*," in
turn, include (1) a certification statement, (2) design
characteristics, (3) limitations and installation requirements,
(4) information on the background of the certifying professional
engineer, (5) the installation address, and (6) the specific USA
Floodair model installed.  (Ex. N to DiMarino Dec. (emphasis in
original).)

     Armed with this template-style certification,[20] upon receipt
of a certification request, USA Floodair now emails Conn
Engineering with the relevant installation and model
information, Mr. Raudebaugh (a non-engineer) completes the basic
information, and then presents it to an engineer, Jason M. Conn,
for review and signature.[21]  (Pl.'s SMF at ¶¶ 94, 104; Def.'s

---

[20] In May 2014, current counsel for USA Floodair approved the
form and use of the sample certification.  (Pl.'s SMF at ¶ 103;
Def.'s RSMF at ¶ 103.)

[21] In other words, the certification process involves no actual
interaction with the property, contact with the structure, or
communication with the architect, designer, or engineer
associated with the structure.  (See Pl.'s SMF at ¶ 106; Def.'s
RSMF at ¶ 106.)  Smart Vent takes issue with this hands-off

RSMF at ¶¶ 94, 104; see also Ex. N to DiMarino Dec. (describing Mr. Conn's professional qualifications).)  As a result, USA Floodair labels its products as compliant with all FEMA and NFIP guidelines guideless engineered openings, and advertises the vents as certified or certifiable by a state registered professional engineer in accordance with TB-1.[22]  (See Pl.'s SMF at ¶¶ 110-17; Def.'s RSMF at ¶¶ 110-17.)

   **E.   Litigation in this District and Markman Decision**

   Based upon the specifications of USA Floodair's product and its claim of NFIP compliance, Smart Vent filed Complaints in this District,[23] asserting claims for patent infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), the New Jersey unfair competition statute,

---

approach to certification, because it claims that the NFIP, as interpreted by TB-1, requires personal contact with the relevant installation space.  In support of this interpretation, though, Smart Vent points to nothing within the NFIP regulations themselves (which remain, in any event, silent on this topic), and the provisions of TB-1 concerning individual certification remain (at least in this respect) ambiguous at best.  Indeed, no aspect of TB-1 requires direct contact by the certifying engineer.  Against that backdrop, the Court can find no fault in USA Floodair's individual certification approach, simply because Mr. Conn never personally observed the relevant property.
[22] USA Floodair's advertisements, as described and depicted above, include various iterations of its NFIP-related claims. Generally speaking, though, USA Floodair advertised its flood vents as "FEMA, ICC and NFIP State Engineered Certified Compliant vents."  (Pl.'s SMF at ¶ 118; Def.'s RSMF at ¶ 118.)
[23] Smart Vent filed the initial Complaint in this action on January 12, 2010 [see Docket Item 1], followed by an Amended Complaint on November 18, 2011.  [See Docket Item 59.]

N.J.S.A. §§ 56:4-1, 4-2, and state common law.  (Am. Compl. at ¶¶ 23-57.)

Following discovery, the Court confronted, as relevant here, the parties' competing positions concerning the construction of the following terms in claim 15 of the '445 patent (with emphasis for the disputed claim terms):

> an **outer frame** having side walls defining a fluid passageway therethrough, wherein the outer frame has a width of a **standard concrete masonry unit (CMU)**, a height of one or two CMUs;
>
> a **door** pivotally mounted in said frame for bidirectional rotation between two open positions and a closed position therebetween to permit tidal water flow therethrough, wherein the door is recessed from the front and back of the outer frame, and includes a ventilation opening.

('445 patent at 3:1-11 (emphases added).)  After surveying the intrinsic and extrinsic record relative to the term "standard concrete masonry unit (CMU)," the Court reasoned that "the reference to 'width and height of a standard concrete masonry unit (CMU),' reflect[ed] that the invention would be used in place of, and sized concordant with, the concrete blocks that generally form foundational crawlspaces."  Smart Vent, Inc., 2014 WL 6882281, at *7.  For that reason, the Court construed the term to refer to a concrete masonry unit with dimensions 8" by 16", $^+/_-$ a $^3/_8$ mortar joint.  Id. at *9; see also Smart Vent, Inc., 2015 WL 5009213, at *2 (revising, slightly, the Court's initial construction on reconsideration).

Turning then to the phrase "outer frame having side walls defining the fluid passageway," the Court determined, guided in large part by the parties' stipulation that the phrase "fluid passageway" meant the "'interior sides of the walls,'" that the claim language supported only the view that the "outer frame" referred to the "border that surrounds the fluid passageway," but excludes the face plate or front portion of the flood vent. Smart Vent, Inc., 2014 WL 6882281, at *9-10.

Finally, based upon claim language and specification, the Court construed the term "door," consistent with its ordinary meaning, "by reference to its intended purpose: providing a mechanism to open and close the flood vent." Id. at *10. In other words, the Court found that the term "door" meant "a movable barrier which can open and close, including pull tabs and a grille backed by screening." Id. at *10-*11; see also Smart Vent, Inc., 2015 WL 5009213, at *4.

In the wake of the Markman decision, and expert discovery, the parties' pending cross-motions for summary judgment followed.

## III. PRELIMINARY ISSUES

Prior to considering the parties' substantive summary judgment positions, the Court addresses, at the outset, three introductory issues concerning (1) the admissibility of Smart Vent's expert report on the topic of infringement, (2) the

25

parties' stipulation on the claim term "recessed," and (3) Smart

Vent's challenges to the admissibility of the supplemental

declarations of Diane Bergaglio, the current owner of USA

Floodair, and Mr. Opatkiewicz, a USA Floodair employee.

**A.   Admissibility of Coulbourne Report**

The Court first addresses USA Floodair's objections to the

admissibility of Smart's infringement expert, William L.

Coulbourne, a licensed professional engineer.

**1.   _Daubert_ Standard**

Federal Rule of Evidence 702 "embodies a trilogy of

restrictions on expert testimony: [1] qualification, [2]

reliability, and [3] fit." Schneider v. Fried, 320 F.3d 396,

404 (3d Cir. 2003) (citing In re Paoli R.R. Yard PCB Litig., 35

F.3d 717, 741-43 (3d Cir. 1994)); see also FED. R. EVID. 702.

As relevant here,[24] the reliability requirement focuses upon

whether the expert's conclusion rests upon "the 'methods and

---

[24] Defendant mounts no specific challenge to Mr. Coulbourne's
qualifications, nor to the general "fit" of his opinions to the
disputed infringement issues in this litigation. (See generally
Def.'s Br. at 3-6.) Rather, Defendant points, more nebulously,
to the fact that Mr. Coulbourne "has no prior experience
reviewing patents or providing infringement opinions" and
provides no "basis" or "source" for "his understanding about the
law of infringement." (Id. at 1, 3.) Nevertheless, in his
expert declaration, Mr. Coulbourne assumes application of
certain basic patent infringement premises (see Coulbourne Dec.
at ¶¶ 13-15), and then details his opinion on the structural and
dimensional identity of the competing flood vents based upon his
many years of professional engineering experience with flood
vents. (See Ex. A to Coulbourne Dec. (describing Mr.

26

procedures of science' rather than on 'subjective belief or unsupported speculation.'" Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993)).[25] Reliability, however, does not require the proffering party to demonstrate the "correctness" of the expert opinion. In re Paoli, 35 F.3d at 744 (concluding that the "evidentiary requirement of reliability" amounts to a lower burden "than the merits standard of correctness"); see also Krys v. Aaron, 112 F.

---

Coulbourne's extensive experience relative to flood vents).) Thus, although USA Floodair takes exception with the somewhat thin nature of Mr. Coulbourne's patent-specific qualifications, his resume reflects that he easily possesses more knowledge than the average lay person regarding structural aspects of flood vents. Indeed, since 1995, Mr. Coulbourne has served as a "consulting structural engineer" in damage investigations caused by floods and hurricanes, has assisted FEMA with "flood mitigation programs," and has served as a member of the Standards Committee for the American Society of Civil Engineers (a body that "'provides minimum requirements for flood resistant design and construction of structures ... located, in whole or in part, in Flood Hazard Areas'"). (Coulbourne Dec. at ¶¶ 4-0.) In view of the breadth of that experience, Mr. Coulbourne easily possesses the minimum qualifications necessary to engage in a technical comparison of the floods vents produced by Smart Vent and USA Floodair.

[25] Where the reliability turns upon the intricacies of an expert's scientific technique, Daubert (and its progeny) directs courts to undertake an inquiry, in essence, into whether the disputed technique has gained acceptance in the relevant scientific community. See In re Paoli, 35 F.3d at 742 n.8 (listing the relevant factors). These "specific factors neither necessarily nor exclusively applies to all experts," Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); see also Kannakeril v. Terminix Int'l, Inc., 128 F.3d 802, 806-07 (3d Cir. 1997) (same), and have no application here, in view of the simplicity of Mr. Coulbourne's opinion.

Supp. 3d 181, 189 (D.N.J. 2015) (same).  Indeed, so "long as an expert's scientific testimony rests upon good grounds ... it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."  United States v. Mitchell, 365 F.3d 215, 244 (3d Cir. 2004) (quoting Ruiz-Troche v. Pepsi Cola Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998)) (emphasis added).  Even more, courts have "'considerable leeway' in determining the reliability of particular expert testimony under Daubert."  Simmons v. Ford Motor Co., 132 F. App'x. 950, 952 (3d Cir. 2005) (quoting Kumho, 526 U.S. at 152-53); see also Kemly v. Werner Co., ___ F. Supp. 3d ____, No. 13-7059, 2015 WL 8335030, at *3 (D.N.J. Dec. 8, 2015) (describing the same analytical framework); Krys v. Aaron, 112 F. Supp. 3d 181, 189-90 (D.N.J. 2015) (same).

### 2.  Mr. Coulbourne's Report is Admissible

Mr. Coulbourne, a professional engineer with over forty years of experience, produced a twelve-page declaration, in which he expressed his view that the flood vent of USA Floodair infringes claim 15 of the '445 patent.  (See generally Coulbourne Dec. at ¶¶ 11, 18.)  As part of his opinion, Mr. Coulbourne explained his understanding of patent infringement principles, the claim language, and constructions reached in the

28

<u>Markman</u> decision.  (<u>See</u> <u>id.</u> at ¶¶ 13-18.)  From these accepted premises, Mr. Coulbourne then detailed the bases for his opinion that the USA Floodair vent includes the construed "'outer frame'" and "'door'" in the form claimed in the '445 patent (and embodied in Smart Vent's commercial product).  (<u>Id.</u> at ¶¶ 22-63.)

In moving to exclude Mr. Coulbourne's declaration on reliability grounds, USA Floodair argues that Mr. Coulbourne failed to apply "reliable principles and methods in reaching his opinions," because he failed to faithfully "accept and apply" the Court's <u>Markman</u> decision.[26]  (Def.'s Br. at 4-6; Def.'s Reply

---

[26] In addition, US Floodair takes aim at Mr. Coulbourne's declaration on account of his failure to consider whether "prosecution history estoppel" or the "specific exclusion principle" bar any argument of infringement under the doctrine of equivalents. (Def.'s Br. at 4-5; Def.'s Reply at 3.) Nevertheless, the application of the doctrine of prosecution history estoppel constitutes a legal question for the Court, not for a technical expert. <u>See</u> <u>Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.</u>, 344 F.3d 1359, 1368 (Fed. Cir. 2003) ("Questions relating to the application and scope of prosecution history estoppel ... fall within the exclusive province of the court."); <u>Warner-Jenkinson Co. v. Hilton Davis Chem. Co.</u>, 520 U.S. 17, 39 n.8 (1997) (explaining that, "if prosecution history would apply ... partial or complete judgment should be [entered] by the court, [because] there would be no further material issue for the jury to resolve").  Indeed, any legal discussion of prosecution history estoppel may have provided, by itself, a basis for exclusion. <u>See, e.g.</u>, <u>Astrazeneca UK Ltd. V. Watson Labs., Inc. (<i>NV</i>)</u>, No. 10-915, 2012 WL 5900686, at *1-*2 (D. Del. Nov. 14, 2012) (discussing the "well-established practice of excluding testimony of legal experts," and barring a patent lawyer from discussing prosecution history estoppel).  USA Floodair's position on the omission of these legal opinions from this engineering expert's report therefore misses the mark.

at 1-7.)  More specifically, USA Floodair takes the position that Mr. Coulbourne restated the claim constructions of the terms "'door'" and "'screen,'" but then implicitly rewrote and/or rejected them, in order to fit Smart Vent's infringement theory.  (Def.'s Br. at 5-6; Def.'s Reply at 2-7.)  As a result, USA Floodair argues that Mr. Coulbourne rendered an unhelpful and essentially irrelevant infringement opinion.  (Def.'s Br. at 5-6; Def.'s Reply at 2-7.)

Nevertheless, the Court finds Mr. Coulbourne's declaration reveals that he accepted and faithfully applied the _Markman_ constructions, and reached an infringement position consonant with his view of the structural aspects of the competing products.  (See generally Coulbourne Dec.)  Indeed, as to the "door," Mr. Coulbourne recognized that the Court construed the term "door" as "'a movable barrier which can open and close, including pull tabs and a grille pattern backed by screening,'" and then applied the construed term "door" to the accused device.  (Id. at ¶¶ 38, 41-42, 48-51.)  In this application, Mr. Coulbourne determined that the door of the accused product literally infringes Smart Vent's "door," because the door of USA Floodair's product acts as a "movable barrier that ... can swing in opposite directions between open and closed positions," includes "a pull tab and ventilation openings in a grille pattern," and sits inwardly "from the front and back of the

30

outer frame, with the exception of a portion of the pull tab."
(Id. at ¶¶ 41-42, 50-51.)  Mr. Coulbourne then opined, in the
alternative, that the door of the accused product infringes
Smart Vent's product under an equivalence analysis, because it
"perform[s] substantially the same function in substantially the
same way to achieve substantially the same result," despite the
fact that the pull tabs protrude "beyond the front of the outer
frame."[27]  (Id. at ¶¶ 56-59.)  Against that backdrop, Mr.
Coulbourne proffered a classical expert opinion, concerning his
application of the construed claim term "door" to the accused
device.

Turning then to the term "screen," Mr. Coulbourne
recognized that the Court construed the term to mean "a
structure having holes which are small enough to prevent
penetration by animals, insects, and other pests, and which are
large enough to permit airflow," but found that no difference
would exist between the construed screen of Smart Vent's product
and the allegedly infringing device of USA Floodair, because the
USA Floodair's product has, in his opinion, equivalent openings
that "allow the free flow of air," all while being "small enough

---

[27] The pull tabs on Smart Vent's device, by contrast, rest in a
"completely recessed" position "from the front and back of the
outer frame."  (Coulbourne Dec. at ¶ 57.)  In other words, the
pull tabs of Smart Vent's product do not protrude, or stick out,
beyond the plane described by the surface of the outer frame.

to ... act as a barrier and [to] prevent penetration by unwanted
items, such as animals."[28]   (Coulbourne Dec. at ¶¶ 39, 43-46.)
Thus, on this issue too, Mr. Coulbourne provided a classical
expert opinion on the hotly-disputed infringement issues in this
litigation.

Finally, with regard to the "outer frame," Mr. Coulbourne
prefaced his opinion, as in other instances, by reference to the
Markman construction of "'outer frame,'" and then expanded upon
that definition by explaining, in his view, how one of ordinary
skill in the art would measure the "'outer frame'" from various
points.  (Id. at ¶¶ 22-23, 26-36.)  More specifically, he
"measured the outer frame with a tape measure,"[29] and determined,

_____

[28] USA Floodair deems Mr. Coulbourne's analysis "glaring[ly]
deficien[t]" because he failed to specify that the barrier of
the accused device could prevent penetration by "'**insects and
other pests**,'" as opposed to only "animals."  (Def.'s Reply at 4
(emphasis in original).)  Nevertheless, a review of Mr.
Coulbourne's conclusions, in their entirety, fairly suggests
that he intended to imbed the notion of "insects and other
pests" within the larger rubric of "animals."  Indeed, he
prefaced his discussion, in relevant part, with the observation
that the construed "screen" has holes "'small enough to prevent
penetration by animals, insects, and other pests.'"  (Coulbourne
Dec. at ¶ 39.)  Against that backdrop, in finding the construed
"screen" identical to the accused screen, Mr. Coulbourne must,
necessarily, have intended to incorporate the idea of "animals,
insects, and other pests," without using the whole phrase a
second time.  The imprecision in his actual language therefore
proves insufficient to warrant exclusion; this narrow
shortcoming, if any, would be better explored through cross-
examination, not exclusion.
[29] USA Floodair challenges Mr. Coulbourne's opinion, in part, on
the grounds that measuring "a flood vent with a tape measure"
requires "no scientific, technical or other specialized

based upon those dimensions and USA Floodair's own product
specifications, that the accused device "fall[s] within the
range of the width and height of a standard concrete masonry
unit as that term has been construed by the Court." (Id. at ¶¶
31, 33, 35-36.)  In other words, Mr. Coulbourne provided, again,
a prototypical expert opinion concerning the manner in which the
construed claim limitations should be applied to the accused
device.

     In sum, the factual narrative underpinning Mr. Coulbourne's
various conclusions resonates with Smart Vent's view of the
disputed, but arguably provable, evidence on the issue of
infringement.  USA Floodair, by contrast, directs it challenges
primarily to the weight of the expert evidence—an issue that can
be aired through cross-examination and argument, and not through
exclusion of his otherwise reliable and relevant work.

     For all of these reasons, the Court finds Mr. Coulbourne's
opinion admissible on the issue of infringement.  The Court next

---

knowledge." (Def.'s Reply at 7.)  USA Floodair's argument,
however, implies that Mr. Coulbourne did little more than
reiterate dimensions contained on USA Floodair's own
specifications.  (See id.)  Rather, Mr. Coulbourne performed his
own measurements to buttress his position that USA Floodair
sized the accused flood vents to fit within "an opening in a
[concrete masonry unit] block wall."  (Coulbourne Dec. at ¶¶ 30-
31.)  This conclusion, although simplistic, then relies upon his
expertise in the engineering and installation of flood vents,
and qualifies as a technical or specialized opinion within the
meaning of Federal Rule of Evidence 702.

addresses USA Floodair's newly-minted, and post-argument, position on the <u>stipulated</u> term "recessed."

## B.   The Parties' Stipulation on the term "Recessed"

During the claims construction phase of this litigation, the Court, as explained above, did not construe the term "recessed," because the parties agreed during the <u>Markman</u> hearing that the term required no construction, and instead meant "'set inwardly from the front and the back.'"  <u>Smart Vent, Inc.</u>, 2014 WL 6882281, at *11 n.10.  Indeed, during the <u>Markman</u> hearing, counsel for USA Floodair specifically proposed that "recessed" be defined as "set inwardly from" the front and the back of Smart Vent's patented flood vent.  (<u>Markman</u> Tr. at 53:6-55:2.)  This Court, in turn, adopted that definition with the consent of the parties.  <u>See</u> <u>Smart Vent, Inc.</u>, 2014 WL 6882281, at *11 n.10 ("The Court need not construe the term 'recessed,' because the parties agreed during the Markman hearing that this term requires no construction, as it means 'set inwardly from the front and the back.'").

During the <u>Markman</u> hearing (and in its briefing), Smart Vent placed great emphasis on the stipulated meaning of "recessed" in its argument on infringement of the construed "door."  USA Floodair, in turn, challenged Smart Vent's infringement position on the merits, but <u>again</u> acknowledged its agreement on the meaning of the term "recessed."  Nevertheless,

34

in the wake of this Court's comments during the <u>Markman</u> hearing, USA Floodair filed a substantively one-paragraph letter, claiming that it made no concession on the meaning of the term "recessed," and requesting that the nearly two-year old <u>Markman</u> decision "be amended to correct [a] clerical error" concerning the meaning of the term "'recessed.'"  [Docket Item 175.] Stated differently, in the aftermath of a hearing where the Court expressed some doubts on the merits of USA Floodair's non-infringement position — and at which time USA Floodair expressed <u>no</u> concern on the understanding of the term "recessed" — it now attempts to reach back to claims construction in order to avoid a potentially adverse outcome on the pending motion.  [<u>See generally</u> <u>id.</u>]

Clearly, USA Floodair's eleventh-hour about-face fails. Indeed, the <u>Markman</u> transcript and resulting <u>Markman</u> decision reveals the parties' <u>uniform</u> understanding that "recessed" meant "set inwardly from the front and the back."  Indeed, the Court adopted that construction at the suggestion of counsel for USA Floodair, and because counsel for Smart Vent voiced no objection.[30]  (<u>See</u> <u>generally</u> <u>Markman</u> Tr. at 53:6-55:2.)  The

---

[30] Smart Vent opposes USA Floodair's last-minute request on precisely that basis.  [<u>See</u> Docket Item 176 at 2 (disputing USA Floodair's position on "clerical error," because the Court "properly construed" the term "'recessed'" based upon the parties' agreement).]

parties' briefing, in turn, reflects the same understanding. Indeed, USA Floodair's own briefing explains that the Court's <u>Markman</u> decision "decided" that: "**recessed**" [means] "set inwardly from the front and back," and then proceeds to apply that construction in its non-infringement argument. (Def.'s Reply at 6-7 (emphasis in original); <u>see</u> <u>also</u> Def.'s Br. at 10 (relying upon the same construction).)

Further, a party can't advance new terms for claim construction beyond those the parties have identified in their pre—<u>Markman</u> submissions under L. Pat. R. 4.3. One could not have an orderly claim construction process and hearing if, after the Court issues its <u>Markman</u> rulings, a party were free to revoke its stipulated construction of a previously undisputed term.

Against that backdrop, the Court finds no support for USA Floodair's claim of a "clerical error" on the construction of the claim term "recessed."[31]  Beyond that, USA Floodair itself

---

[31] Although USA Floodair couches, without support, its request in terms of a "'clerical error,'" it ultimately seeks (when liberally construed) relief in the form typically provided through a motion for reconsideration. [Docket Item 175 (identifying no case or legal support for its request).] Nevertheless, the time to seek reconsideration has long since expired, and will not be reopened under the circumstances presented here. <u>See</u> L. Civ. R. 7.1(i) (requiring that any motion for reconsideration "be served and filed within 14 days after the entry of the order or judgment on the original motion"); <u>see</u> <u>also</u> <u>Ezeiruaku v. Bull</u>, No. 14-2567, 2014 WL 7177128, at *1 n.1 (D.N.J. Dec. 16, 2014) (explaining, with greater detail, the

36

finds no significant "difference in meaning between USA Floodair's proposed construction of the term 'recessed' and the construction" ultimately adopted by the Court.  [Docket Item 175.]  As a result, the Court rejects USA Floodair's reject to amend the Markman decision as frivolous.  The Court last addresses Smart Vent's objections to the admissibility of certain declarations.

## C.  Admissibility of the Supplemental Declarations of Diane Bergaglio and Neil Opatkiewicz

With respect to the unfair competition aspect of this litigation, USA Floodair takes, in essence, a two-fold approach: **first**, USA Floodair claims that the NFIP permits individual certifications in the precise form it provided; and **second**, USA Floodair argues that FEMA accepted its flood vent certifications, even if they fell technically short of the requirements of the NFIP and/or TB-1.  In order to buttress this latter position, USA Floodair points to the declarations of Diane Bergaglio (the current owner of USA Floodair) and Neil Opatkiewicz (an employee of USA Floodair), which memorialize conversations between USA Floodair and Diane Otto, the Planning

---

time deadlines for motions for reconsideration under the Local Rule).  Moreover, even if USA Floodair had timely filed a motion for reconsideration under L. Civ. R. 7.1(i), it would have failed because the Court did not overlook the matter of the meaning of "recessed" (because the parties indicated there was no dispute), nor was there some sort of subsequent change of law.

and Zoning Manager for the City of Tybee Island, Georgia,
concerning conversations Ms. Otto purportedly had with FEMA on
the topic of USA Floodair's sample certification.  (See, e.g.,
Opatkiewicz Dec. at ¶¶ 9, 10, 11, 12, 13, 16, & 18; Bergaglio
Dec. at ¶¶ 4 & 11.)  Smart Vent, in turn, objects to these
portions of the declarations as inadmissible hearsay.  (See
generally Pl.'s Opp'n.)

     "Affidavits or declarations in support of or in opposition
to a motion for summary judgment must 'be made on personal
knowledge,' must 'affirmatively' indicate the affiant's
competence to testify to such matters, and must set forth facts
that would be otherwise 'admissible in evidence.'"  City Select
Auto Sales, Inc. v. David/Randall Assocs., Inc., 96 F. Supp. 3d
403, 409 n.4 (D.N.J. 2015) (quoting FED. R. CIV. P. 56(c)(4);
citing Leese v. Martin, No. 11-5091, 2013 WL 5476415, at *6
(D.N.J. Sept. 30, 2013)).  In other words, on summary judgment,
the Court may credit a factual declaration "only to the extent
[that it] constitutes evidence at least potentially admissible
at trial," id. (citing Hurd v. Williams, 755 F.2d 306, 308 (3d
Cir. 1985)), rather than hearsay without any hope of being
presented through "direct testimony, i.e., 'in a form that would
be admissible at trial.'"  Williams v. Borough of West Chester,
891 F.2d 458, 466 n.12 (3d Cir. 1989) (citation omitted)
("hearsay evidence produced in an affidavit opposing summary

38

judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony, i.e., 'in a form that would be admissible at trial'").

Application of these principles here requires that large portions of the challenged declarations be disregarded, because they recite little more than largely unknown and hearsay exchanges between a non-party and FEMA representatives. (See, e.g., Opatkiewicz Dec. at ¶¶ 9, 10, 11, 12, 13, 16, & 18; Bergaglio Dec. at ¶¶ 4 & 11.)  Indeed, Ms. Bergaglio, for example, states that she received a phone call from "a building official from the City of Tybee Island, Georgia," who requested, on behalf of FEMA, "more information on certifications" USA Floodair had provided for its "flood vents."  (Bergaglio Dec. at ¶ 11.)  Mr. Opatkiewicz discloses, in turn, conversations he had with Ms. Otto regarding exchanges she had with FEMA auditors (see, e.g., Opatkiewicz Dec. at ¶¶ 9, 10, 11, 12, 13, 16, & 18), and then expresses his view based upon these third-party conversations that FEMA found USA Floodair's certifications "acceptable."  (Id. at ¶ 16.)

The Court finds these aspects of the declarations contain classical hearsay upon hearsay (if not, hearsay upon hearsay upon hearsay), because Ms. Bergaglio and Mr. Opatkiewicz learned the proffered information from Ms. Otto (or an associated municipal employee) who in turn received the information from

unidentified (and seemingly unidentifiable) FEMA representatives.  Given the unknown identity of the FEMA declarants, the lack of documentation of any such advice, and the absence of any indication that unknown FEMA agents might testify at trial,[32] the Court will disregard those aspects of the declarations as unprovable hearsay.  Compare Davis v. City of E. Orange, No. 05-3720, 2008 WL 4328218, at *9 n.19 (D.N.J. Sept. 17, 2008) (citations omitted) (declining to disregard hearsay aspects of a declaration because the out-of-court declarant would later present the evidence through direct testimony).

With those prefatory conclusions, the Court turns to the parties' substantive positions on summary judgment.

## IV.  STANDARD OF REVIEW APPLICABLE TO THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A.  Summary Judgment, Generally

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Alabama v. North Carolina, 560 U.S. 330, 344 (2010) (citations and internal quotation marks

---

[32] Indeed, during oral argument, the parties acknowledged that the FEMA representative could not be identified, despite their efforts in discovery.  Indeed, the parties remain embroiled in discovery on this topic, along with discovery targeted towards USA Floodair's ongoing changes to its certification process. [See, e.g., Docket Items 169, 170, & 172.]  During oral argument, however, the parties agreed that the outstanding discovery has no impact on the pending motion.

omitted); see also FED. R. CIV. P. 56(a).  Stated differently,
"[w]here the record taken as a whole could not lead a rational
trier of fact to find for the non-moving party," the Court may
grant summary judgment.  Matsushita Elec. Indus. Co., Ltd. v.
Zenith Radio Corp., 475 U.S. 574, 587 (1986).

     In evaluating a motion for summary judgment, the Court must
view the material facts in the light most favorable to the non-
moving party, and must make every reasonable inference in that
party's favor.  See Scott v. Harris, 550 U.S. 372, 378 (2007);
Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014).  An
inference based upon "'speculation or conjecture,'" however,
"'does not create a material factual dispute sufficient to
defeat summary judgment.'"  Halsey, 750 F.3d at 287 (citations
omitted).  Rather, the non-moving party must support each
essential element with concrete record evidence.  See Celotex
Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

     Moreover, "[t]he standard by which the court decides a
summary judgment motion does not change when the parties file
cross-motions," as here.  United States v. Kramer, 644 F. Supp.
2d 479, 488 (D.N.J. 2008).  In other words, "the court must
consider the motions independently and view the evidence on each
motion in the light most favorable to the party opposing the
motion."  Id. (citation omitted).

**B.    Patent Infringement Standard**

As relevant here, 35 U.S.C. § 271(a) governs direct infringement and provides that, "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States ... during the term of the patent therefor, infringes the patent."  See also Commil USA, LLC v. Cisco Sys., Inc., ___ U.S. ___, 135 S. Ct. 1920, 1926 (2015) (describing the "three forms" of statutory liability for patent infringement).

Evaluation of summary judgment on the issue of infringement (or, noninfringement) requires a two-part inquiry: claim construction by the court of the asserted claim terms as a matter of law, see, e.g., Akzo Nobel Coatings, Inc. v. Dow Chem. Co., 811 F.3d 1334, 1339 (Fed. Cir. 2016); Purdue Pharma L.P. v. Boehringer Ingelheim, GMBH, 237 F.3d 1359, 1363 (Fed. Cir. 2001); Cybor Corp. v. FAS Techs., 138 F.3d 1448, 1454 (Fed. Cir. 1998), **and** then a factual determination of whether the properly construed claim terms "'read on the accused product or method.'" Clare v. Chrysler Grp. LLC, ___ F.3d ____, No. 2015-1199, 2016 WL 1258182, at *2 (Fed. Cir. Mar. 31, 2016) (quoting Georgia-Pac. Corp. v. U.S. Gypsum Co., 195 F.3d 1322, 1330 (Fed. Cir. 1999)); see also Kustom Signals, Inc. v. Applied Concepts, Inc., 264 F.3d 1326, 1332 (Fed. Cir. 2001) (describing the patent infringement analysis as "a question of fact").  In other words,

42

the second stage of the infringement inquiry focuses upon a comparison of the asserted patent claims against the accused invention.  See generally Spectrum Pharm., Inc. v. Sandoz Inc., 802 F.3d 1326, 1336 (Fed. Cir. 2015) (citation omitted).

More specifically, the patent holder must demonstrate, by a preponderance of the evidence, that the accused device infringes the patent either literally or under the doctrine of equivalents.  See Akzo Nobel Coatings, Inc., 811 F.3d at 1339 (citation omitted); see also Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 758 (Fed. Cir. 1984) (citation omitted). Literal infringement, in turn, requires that the accused product include "'every limitation'" in the "'exact[]'" form described by the asserted claims.  Microsoft Corp. v. GeoTag, Inc., ___ F.3d ____ No. 2015-1140, 2016 WL 1274394, at *6 (Fed. Cir. Apr. 1, 2016) (quoting Crown Packaging Tech., Inc. v. Rexam Beverage Can Co., 559 F.3d 1308, 1312 (Fed. Cir. 2009) (internal quotation marks and citation omitted)).  In other words, literal infringement requires (under the so-called "all-elements rule") one-to-one correspondence between the patented invention and the accused device.  See, e.g., Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc., 699 F.3d 1340, 1356 (Fed. Cir. 2012) (citation omitted).

Doctrine of equivalents infringement requires, by contrast, "'equivalence between the elements of the accused product ...

and the claimed elements of the patented invention.'"  Id.
(quoting Duramed Pharm., Inc. v. Paddock Labs., Inc., 644 F.3d
1376, 1380 (Fed. Cir. 2011) (internal quotation marks and
citation omitted)).  More succinctly, a patentee may establish
infringement under the doctrine of equivalents if an element of
the accused product "'performs substantially the same function
in substantially the same way to obtain the same result as the
claim limitation.'"  Spectrum Pharm., Inc. v. Sandoz Inc., 802
F.3d 1326, 1337 (Fed. Cir. 2015) (emphases added) (quoting Pozen
Inc. v. Par Pharm., Inc., 696 F.3d 1151, 1167 (Fed. Cir. 2012)
(citation omitted)).

Under either theory, though, summary judgment may be
granted only if the undisputed factual evidence points to only
one reasonable conclusion regarding infringement.  See Chimie v.
PPG Indus., Inc., 402 F.3d 1371, 1376 (Fed. Cir. 2005);
TechSearch, LLC v. Intel Corp., 286 F.3d 1360, 1369 (Fed. Cir.
2002); Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d
1316, 1323 (Fed. Cir. 2001).  As applied here to the parties'
cross-motions for summary judgment, each party "carries the
burden on its own motion to show entitlement to judgment as a
matter of law after demonstrating the absence of any genuine"
factual disputes.  Massey v. Del Labs., Inc., 118 F.3d 1568,
1573 (Fed. Cir. 1997); see also Baxter Healthcare Corp. v. HQ
Specialty Pharma Corp., 133 F. Supp. 3d 692, 697-98 (D.N.J.

44

2015) (describing and applying the same analytical framework to cross-motions for summary judgment on the issue of infringement).

## V.   DISCUSSION

### A.   Patent Infringement Issues

As explained above, the parties substantively agree that the infringement portion of this litigation hinges upon whether USA Floodair's allegedly infringing device meets, literally or equivalently,[33] the construed claim limitations "outer frame" and "recessed ... door."[34]  The Court will address each claim term in turn.

---

[33] The Court rejects, at the outset, the notion that Smart Vent has conceded the issue of literal infringement.  (See Def.'s Br. at 9-10.)  In its infringement contentions, Smart Vent states that the accused device contains "[a]lmost every limitation" of asserted claim 15.  (Ex. E to Burke Dec. at ¶ 5.)  USA Floodair, in turn, seizes upon this single statement to buttress its position that Smart Vent cannot, by its own admission, prove literal infringement.  (See Def.'s Br. at 9-10.)  Nevertheless, this position relies upon an overly narrow parsing of a single statement, and in any event, Smart Vent explains in its briefing that it included the word "[a]lmost" in recognition of the fact that USA Floodair's product "does not literally" infringe certain claim limitations, like a "grill pattern backed by screening." (Pl.'s Opp'n at 9 n.4 (emphasis in original).)  In other words, Smart Vent intended the term "[a]lmost" to capture undisputed claim terms, and not to waive any of its substantive infringement positions.

[34] The Court rejects, as explained above, the notion that the claim term "screen" presents an additional infringement issue in this action.

> **1. Factual Issues Preclude Summary Disposition of the Parties' Positions on Literal Infringement of the Claim Term "Outer Frame"[35]**

The Court begins, as it must, with the <u>Markman</u> decision, in which the Court construed the term **"outer frame"** to mean "the border that surrounds the fluid passageway, in which the door is mounted, but excluding the face plate or front portion," <u>Smart Vent, Inc.</u>, 2014 6882281, at *10, and the phrase **"width and height of a standard concrete masonry unit (CMU)"** to refer to a concrete masonry unit of the dimensions 8" by 16", $^+/_-$ a $^3/_8$ mortar joint. <u>Id.</u> at *9; <u>see also</u> <u>Smart Vent, Inc.</u>, 2015 WL 5009213, at *2. The Court must then marry these constructions with the claim language that describes "the **outer frame** has a width of a **standard concrete masonry unit (CMU)**, a height of one or two CMUs." ('445 patent at 3:1-11 (emphases added).) In other words, the "outer frame" bears dimensions identical to "the concrete blocks that generally form foundational crawlspaces," <u>Smart Vent, Inc.</u>, 2014 WL 6882281, at *7, in that it sits flush with the interior sides of the walls. <u>See</u> <u>id.</u> at

---

[35] Smart Vent has not briefed the application of doctrine of equivalents infringement to the claim term "outer frame," and argues instead only literal infringement. (<u>See, e.g.</u>, Pl.'s Opp'n at 10-12.) USA Floodair likewise focuses its attention only on literal infringement. (<u>See, e.g.</u>, Def.'s Br. at 12.) Thus, the Court does not address the doctrine of equivalents relative to the claim term "outer frame."

*9-*10 (explaining the parties' stipulation that the phrase "fluid passageway" meant the "interior sides of the walls").

The question of whether USA Floodair's product infringes Smart Vent's patented product turns, in essence, upon whether the accused device contains an outer frame of the dimensions 8″ by 16″, $^+/_-$ a $^3/_8$ mortar joint.  Stated differently, to infringe the '445 patent, the outer frame of USA Floodair's product must have a horizontal distance of 16″, $^+/_-$ $^3/_8$ (i.e., a measurement from 15.625″ to 16.375″), such that it fills the entire fluid passageway (or, the open space left following the removal of the concrete masonry unit).[36]  (Compare Pl.'s Opp'n at 10, with Def.'s Reply at 19.)

In resolving this question, however, the parties advance widely-disparate positions concerning the appropriate dimensional measurements of USA Floodair's product.  Smart Vent, for example, looks to its expert, Mr. Coulbourne, who measured the outer frame of the USA Floodair product (from his perspective) and calculated a width dimension of 15.875, i.e., one that falls squarely within the Court's dimensional construction of the '445 patent.  (See Pl.'s Opp'n at 10-12; see also Coulbourne Dec. at ¶¶ 27-31; Ex. D to Coulbourne Dec.

---

[36] USA Floodair appears to concede that its product meets the vertical distance, or "height" dimension, of the patented device.

47

(setting forth pictorial representations of the measurements).)
USA Floodair, by contrast, argues that the "outer edges" of its
frame "do not" sit flush with "the fluid passageway," and
instead measure only 15.475"—a horizontal dimension outside of
the Court's dimensional construction of the '445 patent.
(Def.'s Reply at 19-21.)  Nevertheless, the Court need not
belabor these competing positions, because genuine factual
disputes pervade the records respectively developed by both
parties.

In support of its bid for summary judgment, Smart Vent
principally relies upon two pieces of evidence: the declaration
of William Coulbourne and a narrow caption of the marketing
materials prepared and distributed by USA Floodair.  (See Pl.'s
Opp'n at 10-12.)  Neither piece of evidence, however,
unequivocally endorses Smart Vent's view.  Indeed, although Mr.
Coulbourne measured the horizontal dimension of USA Floodair's
product as 15.9375", the images depicting his measurements and
the description in his declaration provide scant information
from which to divine the precise starting and ending points for
his calculations.  (See generally Coulbourne Dec. at ¶¶ 26-28;
see also Ex. D to Coulbourne Dec.)  The visual depictions of the
measurements then create the impression that Mr. Coulbourne may
have captured part of the face plate (or, flange), because he
measured the frame from its outward facing portion, rather than

48

the narrower portion that rests within the fluid passage.  (See Ex. D to Coulbourne Dec.)  The relied upon sections of USA Floodair's marketing materials, in turn, do indeed contain support for the view that the outer frame of the flood vent may rest within the construed dimensional limitations of the '445 patent, but also embrace the notion (advanced by USA Floodair) that these measurements take in account the width of the front or rear flange.[37]  (See Ex. E to Coulbourne Dec.)

USA Floodair, in turn, narrows in on this subtle distinction with the following graphic, which well highlights the contours of the parties' nuanced dispute:



(Def.'s Reply at 20.)  From that view, USA Floodair makes the creditable argument that the "outer edge" of the flange (or, the area of "Arguable Surplusage" depicted above) does "not define the boundary of the fluid passageway," and thus does not infringe the '445 patent.

---

[37] Beyond that, the Court harbors doubts about whether USA Floodair can be bound, on an infringement analysis, to its marketing materials, particularly because those materials (as explained by counsel during oral argument) define the measurements of the flood vent in different ways.

In that way, resolving the question of infringement on this claim term will require a factual determination into whether the outer frame of USA Floodair's product should be measured based upon the border inserted into the exterior of the wall (as understood by Smart Vent and depicted above), or only the portion that rests within the fluid passage (as claimed by USA Floodair and depicted above).  This inquiry, in turn, requires a greater factual presentation into the precise manner in which USA Floodair's product sits within the boundary of the fluid passageway.[38]  More specifically, the factfinder must determine which aspect of USA Floodair's vent actually connects to, and sits within, the interior side of the concrete walls—a factual determination that would necessarily inform the infringement analysis.  The robust factual record amassed by the parties here, however, falls short of definitively answering this critical factual issue, among others.

Given this genuine issue of material fact, the Court cannot resolve, one way or another, this question of infringement in

---

[38] In that way, resolution of this question requires far more than a simple application of the Court's claim construction to the accused product.  Indeed, given the structural differences between the two products, the disposition of this inquiry will require a more nuanced comparison (and factual explication) of how the competing vents rest within the fluid passageway.  The determination of infringement would, in turn, flow from that explanation.

the context of summary judgment.[39]  See, e.g., Ethicon Endo-
Surgery, Inc. v. Covidien, Inc., 796 F.3d 1312, 1326-27 (Fed.
Cir. 2015) (vacating summary judgment of noninfringement, based
upon issues of fact concerning whether the accused product met
two claim limitations); Brilliant Instruments, Inc. v.
Guidetech, Inc., 707 F.3d 1342, 1344-46 (Fed. Cir. 2013)
(reversing summary judgment of no literal infringement, where
the declaration of the patentee's technical expert's raised a
fact issue concerning whether the accused product met a claim
limitation).

        For all of these reasons, the Court finds that factual
disputes preclude the entry of summary judgment in favor of
either party on the question of whether accused device meets
(or, infringes) the construed claim term "outer frame."  See FED.
R. CIV. P. 56(a).

        **2.    USA Floodair's Product Literally Infringes the
               Construed Claim Term "Door"**

        With respect to the second claim limitation, the Court
again looks first to the Markman decision, in which the Court
construed the term "door" to mean "a movable barrier which can
open and close, including pull tabs and a grille pattern backed

---

[39] Indeed, in the alternative to its position in favor of summary
judgment, Smart Vent argues that a factual question exists on
the proper measurement of the accused flood vent, thereby
requiring that summary judgment on the issue of infringement be
denied.  (See Pl.'s Opp'n at 12-13.)

by screening." Smart Vent, Inc., 2014 WL 6882281, at *10-*11;
see also Smart Vent, Inc., 2015 WL 5009213, at *4.  The Court
must then place this construction in the context of the claim
language, which describes "a **door** pivotally mounted ... wherein
the door is **recessed** from the front and back of the outer frame,
and includes a ventilation opening."[40]  ('445 patent at 3:1-11
(emphases added).)  As a result, in order to infringe the
construed claim term "door," the door of the USA Floodair
product must be recessed from the front and back of the outer
frame, and must include (1) pull tabs, (2) a grille pattern
backed by screening, and (3) a ventilation opening.

     With respect to these claim elements, though, the parties
only argue about whether USA Floodair's product contains
qualifying pull tabs.  (Compare Pl.'s Opp'n at 13-16, with
Def.'s Reply at 7-14.)  More specifically, USA Floodair takes
the view that the door of its product cannot literally infringe
the construed "door," because the pull tabs of its product
extend outwardly from the front and back of the frame, and not
inwardly as claimed by the construed '445 patent.  (See Def.'s
Reply at 7-14.)  Smart Vent, by contrast, argues that USA
Floodair cannot avoid infringement simply through its inclusion

---

[40] During the Markman phase of this litigation, the parties
agreed, as explained above, that "recessed" for purposes of the
'445 patent means "'set inwardly from the front and the back.'"
Smart Vent, Inc., 2014 WL 6882281, at *11 n.10.

of "an excessively large pull tab," particularly where the "operational" or "critical" aspects of the door, "i.e., the moveable barrier ... with [] holes," remain recessed or partially recessed from the outer frame.  (Pl.'s Opp'n at 13-16.)

In addressing these positions, the Court rejects, at the outset, the notion that the pull tabs constitute, in essence, non-essential features of the flood vent described in the construed '445 patent.  (See id. at 14-16.)  Indeed, in advancing this argument, Smart Vent does little more than rehash arguments previously considered and rejected in these proceedings.  See Smart Vent, Inc., 2014 WL 6882281, at *10-*11 (determining that the pull tabs constitute a critical component of the door, rather than merely an attachment); Smart Vent, Inc., 2015 WL 5009213, at *3 (same).  More specifically, during the Markman phase of this litigation, the Court twice determined, after surveying the claim language and specification, that the "pull tabs serve as an actual component [or element] of the [claimed] door," because they provide "at least one means for its bidirectional rotation."  Smart Vent, Inc., 2015 WL 5009213, at *3 (citation omitted); see also 2014 WL 6882281, at *10-*11.

As a result, the pull tabs constitute an element necessarily subsumed within the claim term "door" (and its

associated claim language), and the nature of the pull tabs on
the USA Floodair product, in turn, necessarily informs the
infringement inquiry.  Stated differently, the USA Floodair
product only infringes, at least literally, if it includes the
pull tab limitation in the "'exact[]'" form described by claim
15 of the '445 patent, Microsoft Corp., ___ F.3d ____, 2016 WL
1274394, at *6 (citation omitted), i.e., a pull tab attached to
a recessed door.[41]

From that premise, though, the parties' positions become
somewhat more nuanced, because USA Floodair argues that its
flood vent products do not include "'recessed'" doors because of
the extended or protruding nature of its pull tabs.  (Def.'s
Reply at 7-14.)  In that way, USA Floodair seeks, in essence, to
superimpose a qualification into the claim language that would

---

[41] Nor do the cases relied upon by Smart Vent compel any
different result.  (See Pl.'s Opp'n at 14 (citations omitted).)
Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931 (Fed.
Cir. 1990), for example, has no relevance here, because it
concerns a doctrine of equivalents analysis into the addition of
non-essential features, and not any inquiry into the literal
infringement of essential claims elements, as here.  Id. at 944-
45.  Tate Access Floors, Inc. v. Maxcess Techs., Inc., 222 F.3d
958 (Fed. Cir. 2000), in turn, addressed whether an entity with
an otherwise infringing product could avoid a finding of
infringement through the inclusion of an additional element to
its product.  Id. at 970.  Here, by contrast, the Court has not
found that the accused flood vent infringes the limitations of
claim 15.  Even more critically, though, the pull tabs
constitute a critical component of the patented device, and not
simply an add-on by an alleged infringer for purposes of
avoiding infringement.

require the door and its components (including, the pull tabs)
to be <u>completely</u> recessed from the front and back of the outer
frame, rather than simply set inward.  (<u>See id.</u>)  That narrow
position, however, finds no support in the plain claim language,
nor in the <u>Markman</u> decision.  (<u>See</u> '445 patent at 3:1-11
(emphasis added) (claiming "a **door** pivotally mounted ... wherein
the door is **<u>recessed</u>** from the front and back of the outer frame,
and includes a ventilation opening").)

    Beyond that, USA Floodair's argument ignores the substance,
meaning, and effect of the parties' agreement on the
construction of the term "recessed."  <u>Smart Vent, Inc.</u>, 2014 WL
6882281, at *11 n.10.  During the <u>Markman</u> proceedings, the
parties agreed, as explained above, that the term "recessed"
means "'set inwardly from the front and the back.'"  <u>Smart Vent,
Inc.</u>, 2014 WL 6882281, at *11 n.10.  As applied here, the
language of that definition implies that the "recessed" pull
tabs would <u>begin</u>, or be "'set,'" from an inward position, but
provides no reasonable basis to require that the entire depth of
the pull tabs remain within the frame to be considered recessed.
Rather, it requires only that the starting portion of the pull
tabs be set inward.

    Against that backdrop, the Court finds, as a matter of law,
that the door of USA Floodair's allegedly infringing flood vent
literally infringes the "recessed ... door" limitation of the

'445 patent, because its starting point rests within the outer frame.  In other words, the undisputed factual record demonstrates only the conclusion that the USA Floodair flood vent contains a recessed door, with pull tabs, a grille pattern backed by screening, and a ventilation opening.  For all of these reasons, the Court finds Smart Vent entitled to summary judgment on the question of whether the USA Floodair product literally infringes the construed claim limitation "recessed ... door."[42]  See FED. R. CIV. P. 56(a).  USA Floodair's cross-motion

---

[42] Turning briefly to the parties' alternative positions on doctrine of equivalents infringement, the Court notes USA Floodair's argument that prosecution history estoppel bars Smart Vent from pursuing the doctrine of equivalents, because the narrowing amendment "recessed" arose during the recent reexamination.  (See, e.g., Def.'s Br. at 14-17; Def.'s Reply at 14-19.)  USA Floodair's argument, however, misses the mark.  Generally speaking, "'[p]rosecution history estoppel limits the broad application of the doctrine of equivalents by barring an equivalents argument for subject matter relinquished'" or narrowed during prosecution, and can occur "'in one of two ways, either (1) by making a narrowing amendment to the claim ("amendment-based estoppel") or (2) by surrendering claim scope through argument to the patent examiner ("argument-based estoppel").'"  Intendis GMBH v. Glenmark Pharm. Inc., USA, ___ F.3d ____, No. 15-1902, 2016 WL 2848916, at *6 (Fed. Cir. May 16, 2016) (citation omitted).  This preclusion, however, does not apply where "'the rationale underlying the [narrowing] amendment...bear[s] no more than a tangential relation to the equivalent in question.'"  Id. (citation omitted).  In this case, the "recessed" limitation constitutes a narrowing amendment, but the prosecution history contains no mention of the "pull tabs," because the pull tabs bore at most a tangential relation to the "recessed" amendment—circumstances well-highlighted by counsel for Smart Vent during oral argument.  Thus, Smart Vent may still rely upon the doctrine of equivalents.  Turning then to how those principles apply here, the Court concludes that, even if it found no literal

for summary judgment on the same issue will, accordingly, be denied.  The Court last addresses Smart Vent's claims of unfair competition.

**B.   Unfair Competition Issues**

In its unfair competition claims, Smart Vent generally alleges that USA Floodair engaged in "willful acts of unfair competition" in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), the New Jersey unfair competition statute, N.J.S.A. §§ 56:4-1, 4-2, and state common law, by falsely and/or misleadingly identifying its flood vents as certified as compliant by FEMA, the ICC, and the NFIP.  (See Am. Compl. at ¶¶ 30-57.)

In seeking summary judgment on these claims, USA Floodair contends that its individual engineering certificates plainly complied with TB-1, and that Smart Vent cannot show any harm derived from "USA Floodair's limited use of [its] admittedly ambiguous [certification] language."  (Def.'s Br. at 18-23.)  In its competing motion for summary judgment, by contrast, Smart

---

infringement because of the protruding nature of the pull tabs (which it does not), the USA Floodair vent would still infringe the "door" limitation under an equivalence analysis, because the pull tabs differ in an insubstantial way, and otherwise perform substantially the same function in substantially the same way to obtain substantially the same result, because both enable manual bidirectional rotation.  See Voda v. Cordis Corp., 536 F.3d 1311, 1326 (Fed. Cir. 2008) (describing the "'difference phrasings of the test for equivalence'").

Vent seeks summary judgment on the TB-1 and poster-related issues raised in USA Floodair's motion, and on the grounds that USA Floodair's promotional materials included:

a.   Literally false statements in its individual flood vent certifications that those certifications are issued in accordance with FEMA, NFIP and TB-1 requirements for engineered openings;

b.   Literally false statements in its individual flood vent certifications that those certifications follow design requirements and specifications that are established in TB-1;

c.   Literally false statements in its marketing and promotional materials that each of their vents can be certified by a state registered professional engineer as stated in TB-1 and that their flood vents are compliant with all FEMA and NFIP guidelines for engineered openings;

d.   Literally false statements in its marketing and promotional materials that its flood vents are designed and constructed to meet the FEMA and NFIP requirements and guidelines and also are created to fulfill FEMA and NFIP guidelines;

e.   Literally false statements on its website that FEMA and NFIP requirements for engineered openings are met by its flood vents;

f.   Literally false statements in its marketing and promotional materials that its customers will "save money" on their flood insurance, and flood insurance savings of up to 80% can be obtained with the purchase of their flood vents; and

g.   Literally false statements on posters exhibited at two trade shows, one in 2008 and one in 2009 that its flood vents are "FEMA, ICC and NFIP State Engineered Certified Compliant Vents."

(Pl.'s Opp'n at 23-25.)  In more succinct and demonstrative

terms, Smart Vent takes issue with the following advertisements:





(Exs. A & Q to DiMarino Dec.)  Nevertheless, because the

regulations of the NFIP, as addressed above, require nothing

more than a certification, the only statements that fairly

buttress Smart Vent's unfair competition claims become those

directed at compliance with TB-1.  More specifically, Smart

Vent's claim essentially hinges upon whether Smart Vent falsely

or misleadingly described its product as certified in accordance with TB-1.

Section 43(a) of the Lanham Act governs claims of unfair competition, and permits a civil action against:

> [a]ny person ... [who] uses ... any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... misrepresents the nature, characteristics, qualities, or geographic origin of ... [the] goods, services, or commercial activities...

15 U.S.C. § 1125(a)(1)(B).[43]   In other words, section 43(a) provides "broad protection against various forms of unfair competition and false advertising," by specifically prohibiting false or misleading factual statements concerning commercial products.  Presley's Estate v. Russen, 513 F. Supp. 1339, 1376 (D.N.J. 1981) (citations omitted).  A claim of false or misleading representations, in turn, requires a showing:

> a.   that the defendant made a false or misleading statement concerning its product;

---

[43] The New Jersey unfair competition law states that "[n]o merchant, firm or corporation shall appropriate for his or their own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals."  N.J.S.A. § 56:4-1.  Unfair competition under New Jersey common law, however, constitutes a far more amorphous area, without any clear catalogue of the acts which amount to unfair competition.  See, e.g., Interlink Prods. Int'l, Inc. v. F & W Trading LLC, No. 15-1340, 2016 WL 1260713, at *5 (D.N.J. Mar. 31, 2016).  Nevertheless, because "unfair competition claims under New Jersey statutory and common law generally parallel those under § 43(a) of the Lanham Act," the Court need not conduct any separate inquiry into the state law requirements.  Bracco Diagnostics, Inc. v. Amersham Health, Inc., 627 F. Supp. 2d 384, 454 (D.N.J. 2009).

b.     that the statement caused actual deception or at
       least created a tendency to deceive a substantial
       portion of the intended audience;

c.     that the deception likely influenced purchasing
       decisions by consumers;

d.     that the advertised goods traveled in interstate
       commerce; and

e.     that the statement created a likelihood of injury
       to the plaintiff in terms of declining sales,
       loss of good will, etc.

See Warner-Lambert Co. v. Breathasure, Inc., 204 F.3d 87, 91-92

(3d Cir. 2000).

     The Court has already determined, as detailed above, that

TB-1 calls for an individual certification different from that

provided by USA Floodair.  In other words, the Court concludes,

as a matter of law, that USA Floodair made at best a misleading

and at worst a false statement that the USA Floodair vents

comply with TB-1.  The undisputed evidence in that respect

therefore satisfies the first element.  Beyond that, the parties

agree that the USA Floodair vents traveled in interstate

commerce (see Pl.'s SMF at ¶ 5; Def.'s RSMF at ¶ 5),

establishing the fourth requirement for an unfair competition

claim.  As a result, the Court finds the entry of partial

summary judgment appropriate on the first and fourth elements.

     The evidence on the remaining elements, however, remains

far sparser and insufficient to warrant summary judgment on the

overall unfair competition claim.  Indeed, Smart Vent provides
little, if any, actual evidence on the issues of likely
deception, the factors influencing consumer purchasing
decisions,[44] nor any quantification or presentation on the injury
to Smart Vent from these false statements.  Rather, Smart Vent
points, more nebulously, to speculation and attorney argument,
but its factual record falls short of demonstrating the absence
of any triable issue on these elements of an unfair competition
claim.  Smart Vent claims, for example, that USA Floodair's
misrepresentations have "diverted" sales from Smart Vent to USA
Floodair, but provides no support for that assertion.  (Pl.'s
SMF at ¶ 125; see also Little Dec. at ¶ 37.)  While there is a
reasonable inference that USA Floodair's misrepresentation that
its product complies with TB-1 led to increasing its sales and
decreasing Smart Vent's sales, that inference is unavailable to
Smart Vent as the movant in its summary judgment motion.  Beyond
that, it relies only upon the self-serving declaration of its
own Vice-President, who likewise advances the belief of
diversion, but points to no empirical evidence (in the form of

---

[44] The Court recognizes the parties' substantive agreement that
NFIP certification decreases flood insurance premiums.  (See,
e.g., Ex. H to Graham Dec. at 4.)  That circumstance, in turn,
creates at least the impression that certification-related
statements would influence purchasing decisions.  That
reasonable impression, however, still stops short of
demonstrating the absence of a triable issue, particularly given
the parties' otherwise limited attention to this requirement.

sales data or otherwise) to substantiate that notion.  (See Little Dec. at ¶ 37.)  USA Floodair explains, by contrast, that "consumers chose to buy flood vents from USA Floodair rather than Smart Vent because USA Floodair offers a more cost effective" and low maintenance "product."  (Def.'s RSMF at ¶ 125.)  State differently, USA Floodair hones in on aspects of its product, aside from certification, that make it attractive to consumers, and then augments its assertion with a declaration that specifically highlights these practical advantages.  (See Opatkiewicz Supp. Dec. at ¶ 13 (explaining that many consumers may choose USA Floodair's product, because it has "a more simple construction" and requires little maintenance, while "Smart Vent's flood vents require maintenance twice a year").)

Turning then to the issue of deception, Smart Vent adduces no facts to demonstrate satisfaction of this element.  Indeed, Smart Vent makes no mention of the term "deception" in any portion of its 125-paragraph statement of material facts.  USA Floodair claims, in turn, that its marketing "language" caused no confusion, but relies only upon Mr. Bergaglio's speculation on a topic for which she has no personal knowledge, and not any actually admissible evidence.

In view of these obviously disputed factual issues, summary judgment on the second, third, and fifth elements will be denied.

## VI.  CONCLUSION

For all of these reasons, USA Floodair's motions for summary judgment and to strike will be denied, and Smart Vent's cross-motion for summary judgment will be granted in part and denied in part to the extent it concerns infringement of the '445 patent, and granted in part and denied in part to the extent it concerns unfair competition.  An accompanying Order will be entered.


**June 27, 2016**                    **s/ Jerome B. Simandle**
Date                                 JEROME B. SIMANDLE
                                     Chief U.S. District Judge